**HEATRANSFER CORPORATION,**
Plaintiff-Appellee,

v.

**VOLKSWAGENWERK, A. G., et al.,**
Defendants-Appellants.

No. 75–2779.

United States Court of Appeals,
Fifth Circuit.

June 13, 1977.

Charles T. Newton, Jr., Houston, Tex.,
Cicero C. Sessions, New Orleans, La., Her-

bert Rubin, Cecelia H. Goetz, New York City, Richard A. Posner, Chicago, Ill., for defendants-appellants.

John L. Jeffers, Jr., Ralph S. Carrigan, Alan S. Gover, Houston, Tex., for plaintiff-appellee.

Bennie Bock, II, New Braunfels, Tex., for other interested party.

Before GOLDBERG, SIMPSON and FAY, Circuit Judges.

SIMPSON, Circuit Judge:

## I. PRELIMINARY STATEMENT

This appeal has generated a record of giant proportions. We are presented with 37 volumes of transcript, nine appendix volumes of abbreviated transcript, six briefs totalling 409 pages (with 83 pages of appendices), over 1600 exhibits, and considerable correspondence to this Court from the parties. We have done our best to pare down the issues and arguments presented on appeal, and the discussion and disposition of those issues and arguments, to the greatest extent possible consistent with rea- soned resolution of the controlling questions presented. The result is an opinion still regrettably overlong.

## II. NATURE AND DISPOSITION OF THE CASE

Plaintiff-appellee Heatransfer Corporation filed a private antitrust suit, pursuant to Section 4 of the Clayton Act, 15 U.S. Code, Section 15, against defendants-appellants Volkswagenwerk Aktiengesellschaft (VWAG); its wholly-owned subsidiary, Volkswagen of America, Inc. (VWoA); and two wholly-owned subsidiaries of VWoA, Volkswagen South Central Distributor, Inc. (VWSC) and Volkswagen Products Corporation (VPC). Heatransfer's complaint alleged multiple violations of Sections 1 and 2 of the Sherman Act, 15 U.S.Code, Sections 1–2, and Section 7 of the Clayton Act, 15 U.S.Code, Section 18.

The case was tried before a six-person jury, and was submitted for special verdict under Rule 49(a), Federal Rules of Civil Procedure, with 15 written Questions to be answered by the jury.[1]

The jury's findings, in response to the written questions submitted may be summarized as follows:

1. The Questions were as follows:

Questions as to Section 1 of the Sherman Act.

Question 1. Do you find from a preponderance of the evidence that the provisions of the Volkswagen dealer and distributor franchise agreements constitute tying arrangements under Section 1 of the Sherman Act? Burden of proof is on plaintiff.

Answer yes or no.

If you answered the above question "No", do not answer question 2 and do not consider defendants' conduct with respect to the franchise agreements in violated Section 1. If you have answered question 1 "Yes", then proceed to answer question 2.

Question 2. Do you find from a preponderance of the evidence that the tying arrangement contained within the dealer and distributor franchise agreements was necessary in order to preserve the goodwill of the defendants? Burden of proof is on defendants.

Answer yes or no.

If you have answered question 2 "Yes", do not consider the defendants' conduct with respect to the franchise agreements in determining if the defendants have otherwise violated Section 1 of the Sherman Act. If you have answered question 2 "No", you may consider the defendants' conduct in determining whether such a violation has occurred. In any event, you will proceed to answer question 3.

Question 3. Do you find from a preponderance of the evidence that Volkswagen Products Corporation (VPC) was a part of a conspiracy, combination or agreement to restrain trade unreasonably in violation of Section 1 of the Sherman Act? Burden of proof is on plaintiff.

Answer yes or no.

Question 4. Do you find from a preponderance of the evidence that Volkswagen of America (VWOA) or Volkswagen South Central was a part of a conspiracy, combination or agreement to restrain trade unreasonably in violation of Section 1 of the Sherman Act? Burden of proof is on plaintiff.

Answer yes or no.

Question 5. Do you find from a preponderance of the evidence that Volkswagen Germany (VWAG) was a part of a conspiracy, combination or agreement to restrain trade unreasonably in violation of Section 1 of the Sherman Act?

Answer yes or no.

(1) The provisions of the Volkswagen dealer and distributor franchise agreements constitute tying agreements, in violation of Section 1 of the Sherman Act.

Questions as to Section 2 of the Sherman Act.

Question 6. Do you find from a preponderance of the evidence that the relevant market in considering Section 2 of the Sherman Act was the manufacture and sale of air conditioners for only Volkswagen, Porsche and Audi automobiles throughout the world, rather than either the manufacture and sale of air conditioners for all automobiles or for all compact automobiles in the United States? Burden of proof is on plaintiff.

Answer yes or no.

If you have answered question 6 "No", and only in that event, then do not answer questions 7, 8, or 9, but proceed to answer Question 10. If you have answered question 6 "Yes", then answer questions 7, 8 and 9.

Question 7. Do you find from a preponderance of the evidence that the defendant VWOA or Volkswagen South Central monopolized, attempted to monopolize, or conspired to monopolize, in violation of Section 2 of the Sherman Act? Burden of proof is on plaintiff.

Answer yes or no.

Question 8. Do you find from a preponderance of the evidence that the defendant VPC monopolized, attempted to monopolize, or conspired to monopolize, in violation of Section 2 of the Sherman Act? Burden of proof is on plaintiff.

Answer yes or no.

Question 9. Do you find from a preponderance of the evidence that the defendant VWAG monopolized, attempted to monopolize, or conspired to monopolize, in violation of Section 2 of the Sherman Act? Burden of proof is on plaintiff.

Answer yes or no.

Questions as to Section 7 of the Clayton Act.

Question 10. Do you find from a preponderance of the evidence that the relevant market in considering Section 7 of the Clayton Act was the manufacture and sale of air conditioners for only Volkswagen, Porsche and Audi automobiles, rather than either the manufacture and sale of air conditioners for all automobiles or for all compact automobiles. Burden of proof is on plaintiff.

Answer yes or no.

If you have answered question 10 "No" and only in that event, do not answer questions 11, 12 or 13, but proceed to answer question 14. If you have answered question 10 "Yes", then answer questions 11 and 12 as well as question 13, if applicable.

Question 11. Do you find from a preponderance of the evidence that the acquisition [sic]

(2) VWAG, VWoA (or VWSC), and VPC each (a) engaged in a conspiracy, combination, or agreement to restrain trade unreasonably, in violation of Section 1 of the

the assets of Intercontinental Motors by VWOA may substantially lessen competition in the sale of Volkswagen, Porsche and Audi air conditioners in violation of Section 7 of the Clayton Act? Burden of proof is on plaintiff.

Answer yes or no.

Question 12. Do you find from a preponderance of the evidence that Delanair Engineering was a failing company? Burden of proof is on the defendants.

Answer yes or no.

If you have answered question 12 "yes", do not answer question 13. If you have answered question 12 "No", proceed to answer question 13.

Question 13. Do you find from a preponderance of the evidence that the acquisition of the stock of Delanair Engineering by VWOA, either separately or in combination with the acquisition of Intercontinental Motors, may substantially lessen competition in the sale of Volkswagen, Porsche and Audi air conditioners in violation of Section 7 of the Clayton Act? Burden of proof is on plaintiff.

Answer yes or no.

Questions as to Proximate Cause and Damages.

If you have found as a result of your previous answers that one or more of the defendants have violated Section 1 of the Sherman Act and/or Section 2 of the Sherman Act and/or Section 7 of the Clayton Act, then answer question 14. Otherwise, do not answer such question.

Question 14. Do you find from a preponderance of the evidence that plaintiff Heatransfer Corporation sustained injury to its business or property which was directly and proximately caused by such violation or violations on the part of defendant or defendants? Burden of proof is on plaintiff.

Answer yes or no.

If you have answered question 14 "No" and only in that event, do not answer question 15. If you have answered such question "Yes", then proceed to answer question 15.

Question 15. What sum of money, if any, do you find would be required, if paid now in cash, to compensate plaintiff Heatransfer Corporation for any damages suffered by it by reason of such injury to its business or property which you have found was proximately caused by such violation or violations found in answer to Interrogatory 14? Burden of proof is on plaintiff.

Answer by inserting the amount, if any.

Sherman Act; and (b) conspired or attempted to monopolize, or monopolized, the sale of air-conditioners for Volkswagen, Porsche, and Audi automobiles throughout the world, in violation of Section 2 of the Sherman Act.

(3) The acquisition by VWoA of Inter Continental Motors Corp. may substantially lessen competition in the sale of air-conditioners for Volkswagen, Porsche, and Audi automobiles, in violation of Section 7 of the Clayton Act.

(4) Delanair Engineering Co. was not a failing company, and VWoA's acquisition of Delanair may substantially lessen competition in the sale of air-conditioners for Volkswagen, Porsche, and Audi automobiles, in violation of Section 7 of the Clayton Act.

(5) Heatransfer sustained injury to its business or property that was directly and proximately caused by one or more of the violations found, and its damages were $5 million.

The damage award was trebled pursuant to 15 U.S.C., Section 15,[2] and an attorney's fee of $350,000 was added to the judgment, making a total judgment of $15,350,000.

### III. THE FACTS

The facts as we state them were largely uncontroverted at trial, although sometimes subject to contrary inferences. As to facts in dispute, we state them in a manner consistent with the jury's Special Verdict, and as supported thereby.

A. *Background*

The distribution system of Volkswagen products in the United States is essentially VWoA. VWoA buys automobiles and parts from VWAG for resale in this country. During the relevant time period, VWoA sold four basic types of Volkswagen vehicles: Type I—the "Beetle"; Type II—the "VW bus", a large station wagon, which is also available as a camper; Type III—a squareback, which is also available as a small station wagon; and Type IV—a larger, more powerful, version of the Type III. All of the above models have air-cooled engines mounted in the rear of the car, although in 1973, the Type III was replaced by the Dasher, which has a front-mounted, water-cooled engine.

Since 1969, VWoA has also imported the Porsche 911—an expensive sports car manufactured by Porsche; and the Porsche 914, an economy sports car manufactured jointly by VWAG and Porsche.[3] Both Porsche models have air-cooled engines. In 1970, VWoA began importing the Audi, a medium-sized car with a front-mounted, liquid cooled engine.

From its inception in 1956 until the early 1960s VWoA distributed the products it imported to 14 independent Volkswagen distributors in the continental United States.[4] These distributors were independently owned wholesale operations which purchased Volkswagen, Porsche, and Audi cars, parts, and accessories from VWoA, and purchased some parts and accessories from other suppliers as well. The distributors resold these products to the automobile dealers.[5] Beginning in the 1960s, VWoA began purchasing these distributorship operations, and by the time of trial of this case it had acquired 8 of the original 14 distributorships.

---

**2.** The Clayton Act, § 4, 15 U.S.C. § 15 reads:
 Any person who shall be injured in his business or property by reason of anything forbidden in the anti-trust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

**3.** The Porsche had been imported into this country by an importer other than VWoA for a number of years prior to 1969.

**4.** There was also one small distributor in Hawaii.

**5.** At the time of trial, there were in this country approximately 1200 Volkswagen dealers, 300 Porsche-Audi dealers, with approximately 100 of these dealerships overlapping. Trial Record (T.R.), pp. 3530–3531.

By 1968, VWoA was selling more than a half million new Volkswagens per year in the United States, which amounted to just over 55% of all imported car sales, and 5.5% of the total United States car market. By 1970, Volkswagen sales mounted to 6.8% of total automobile sales in the United States, with approximately 570,000 Volkswagens sold that year. Its percentage of the foreign car market for 1970 was 46.2%. By 1973, due to much stronger competition from other importers, VWoA (Volkswagen, Porsche and Audi) maintained 31.3% of the imported car market, and the Volkswagen percentage of the total car market had fallen to 4.1%. These figures were still very impressive considering the increase of sales among domestic and foreign manufacturers of cars in direct competition with VWoA imports.

None of these cars imported by VWoA had factory-installed air-conditioners. Since air-conditioning was becoming almost a standard item in the United States by the end of the 1960s, there appeared to be a waiting market for an air-conditioner that would function satisfactorily in the VWoA imports.[6]

VWAG first attempted in 1973 to install factory air-conditioning in automobiles for export to the United States. One thousand Audi cars were equipped with factory installed air-conditioners before being shipped to the United States. The results were not impressive. T.R., pp. 3674–3676.

### B. Automobile Air-Conditioning

The basic components of an automobile air-conditioner are: the compressor; a pump, powered by the automobile engine, which circulates the coolant; the condenser, which uses the car's airflow, supplied principally by the car's movement and the radiator fan, to condense the coolant gas into liquid form; and the evaporator, where the liquid evaporates and is blown as cold air into the car.

In water-cooled cars, the condenser is placed in front of the radiator, so that outside air, "ramming" through the front of the car, can help to supply the condenser with its need for a flow of air coming over it. The main airflow, however, is supplied by the radiator fan.

In the air cooled, rear engine Beetle Volkswagen, this technique was not practicable. Ramming of outside air over the condenser would be impossible with the condenser in the rear with the engine. And, of course there was no radiator fan to provide the necessary constant airflow.

To overcome these problems, Don P. Dixon, founder of the DPD Manufacturing Company, designed a condenser that would fit behind the spare tire in the front compartment of the Beetle, and a separate fan that would provide independent airflow for the condenser. He also designed a compressor to fit in the rear engine compartment next to the engine, and an evaporator to fit partially in the front end of the car and partially under the dashboard in the passenger compartment. Because of the scattered placement of the component parts of the air-conditioning unit, it was necessary to run hoses and electrical wires underneath the floorboard to make the component parts function as a working unit.

Delanair Engineering Company,[7] which became VWoA's approved supplier in 1963, had also designed a compressor to fit in the rear engine compartment next to the en-

---

**6.** A primary reason for the lack of factory air-conditioning in the imported German cars may have been a belief by the importers that German air-conditioning manufacturers lacked expertise in the air-conditioning field. John Stuart Perkins, President of VWoA, testified at trial:

> You cannot find an engineer [in Germany] who understands air-conditioning. And we were not interested in having any part of air-conditioning from Germany, who are

making their first air-conditioners, we would much sooner do business here in the States, particularly here in Texas, where it seemed to be the center of air-conditioning, where we had the talent, where we had the expertise, and were quite happy with that.
T.R., p. 3672.

**7.** Delanair was a subsidiary of an English company, Delaney-Gallay Ltd., itself in turn a subsidiary of another English company, Lindustries Ltd.

gine. The condenser system designed by Delanair, however, was markedly different from the DPD front-located condenser system. Delanair designed two condensers which were to be placed under the rear of the car. They were connected by tubing with a propeller fan blowing air over one of the condensers. The evaporator was placed entirely under the dash in the passenger compartment. The main defect with the Delanair unit was that the condensers were constantly exposed to damage because of their proximity to the road surface.[8] Aside from the difficulties associated with the DPD and the Delanair units, both offered at least some solution to the Beetle's lack of a radiator fan by providing independent airflow within the condenser system.

In 1963, Henry Willard Lende, Jr., formed a company, Heatransfer Corporation, for the purpose of selling the DPD units to Volkswagen dealers. Lende testified at trial that the main obstacle to his sales efforts were the problems encountered installing the unit:

"Those fellows [working for the dealers] didn't know how to install an air conditioner, because it was a new product, and it was an involved complicated product. You had mechanics putting mechanical things in a car, and then you had some chemistry in it, and you had to know how to put freon in, and you had to pull the air out of this, it's called pulling a vacuum before you put the freon, because if you have air in with the freon the thing won't work. You had to use a vacuum pump to pull all the air out, and you had to use gauges to put the freon in. You had to do a little electrical work, and then check it and know how to troubleshoot it.

But before I would get out the door, he would say, 'Does my mechanic know how to fix this thing? Sure, it runs now, but if that customer comes back in, what are we going to do, I'm the fellow that's in the soup.'

So, I teach the fellow how to troubleshoot and service that air conditioner, if it came in and wasn't working, what to look for first, was it out of freon, had a belt that slipped. Then, I go up and teach the salesmen how to sell it. They didn't know what knob did what, whether it was high, medium low fan, or what, and they didn't know what the thermostat did and all these things. It was a brand new industry. And if you didn't do this, didn't get the whole dealership squared away, they couldn't do a job of selling it." T.R., pp. 141–142.

With Lende's Heatransfer Corporation as its sales company, DPD's sales increased from 200 VW Beetle air-conditioning units in 1963 to 7000 units in 1968. During 1968, however, Lende learned of another unit being sold to Volkswagen dealers with the VWoA stamp of approval (manufactured by Overseas Motors Corporation of Fort· Worth, Texas—later Delanair Engineering Company), which was selling far more units to Volkswagen dealers than was DPD. Approval by VWoA meant that VWoA would purchase large quantities of the approved Delanair unit and sell them to Volkswagen dealers. Efforts by Lende and Dixon to secure VWoA approval of the DPD unit were unsuccessful.

Since a distributorship allowed the dealer the opportunity of ordering all of his parts and accessories from one central location rather than from a number of suppliers, Lende recognized that it would be advantageous to approach these distributors, rather than the individual dealers, concerning the purchase of DPD units. Because his unit was not approved by VWoA, he met with opposition, aggravated by VWoA's promotion of the Delanair unit.

In 1968, however, Lende's efforts were rewarded when the second largest seller of air-conditioners among the Volkswagen distributors, International Auto Sales in New Orleans, agreed to purchase units from

---

**8.** A parts manager for a Volkswagen dealership testified that:

"It would take us like two days to put an air conditioner in one and, you know, the thing would get down the road, three or four hundred miles down the road, and everything would fall off of it out in the middle of the road . . . ."

DPD. Lende found this to be a particularly significant and encouraging development because it was the first time in his experience that a Volkswagen distributor had been willing to abandon an approved VWoA part or accessory for one that had not been approved. To Lende this indicated that other distributors might be willing to consider an alternative to the Delanair unit.

After securing the New Orleans business for DPD, Lende severed his relationship with that company. He had been developing his own concept of an air-conditioner for the Beetle, and decided that the time was ripe to produce and market that concept.

#### C. *The Heatransfer Unit*

In the Heatransfer unit all major component parts were located in the rear of the vehicle by placing the condenser and the evaporator in a box which was installed behind the back seat of the Beetle with a small opening in the floor pan behind the back seat which allowed the condenser to remove heat and further allowed the condenser-evaporator module to be connected by hoses to the engine compartment where the compressor was located. The unit was designed to feed cold air into the car's passenger compartment in a constant flow, along the roofline from the back of the car to the front of the car. The new unit was particularly distinctive for two reasons. It was relatively easy to install as compared with other units, and the location of the condenser reduced significantly the chance of damage to it.

As Lende began marketing Heatransfer units in early 1969, he approached Guenter Kittel, at the time VWoA's Vice President of Parts (he is presently President of a VWAG affiliate), concerning approval of the Heatransfer unit. Because Delanair was having severe problems at about this time, Lende had grounds for hope that his unit would get VWoA approval. At this same time, Lende was also soliciting Intercontinental Motors in San Antonio, Texas, the largest seller of air-conditioners among VWoA distributors. Intercontinental Motors agreed to purchase and sell the Heatransfer unit in June of 1969 even though it had not received the VWoA stamp of approval. By the end of the summer Heatransfer had sold 1800 units to Intercontinental.

At this time, Delanair was losing ground on other fronts. Delanair lost the business of the New Orleans distributorship to DPD, and the business of the California distributorship, Volkswagen Pacific, to Meierline, a California company. In the summer of 1969, distributor orders for the Delanair dropped drastically. VWoA had projected sales of 13,000 for the months of July, August, and September, but, in actuality, sales for those months amounted to 1280, 372 and 26 units respectively. Plaintiff's Exhibit (PX)—7.

Delanair's English-based parent company, Delaney-Gallay, Ltd., decided not to expend the effort to rehabilitate Delanair, but rather to sell it. On September 29, 1969, it was announced that VWoA had acquired Delanair for a new wholly-owned subsidiary which VWoA named Volkswagen Products Corporation (VPC). During the three months following the purchase of Delanair, VPC sales increased markedly in comparison with Delanair's preceding three months. In October 1, 1,399 units were sold, in November, 1,193 units, and in December, 999 units.

In October of 1969, VWoA acquired the largest American Volkswagen distributorship, Intercontinental Motors of San Antonio, and renamed it Volkswagen South Central Distributor, Inc. (VWSC). Before the acquisition Heatransfer had had a 65%–35% advantage over Delanair in terms of unit sales by Intercontinental to dealers. By the end of the first year after the acquisition, the advantage had been reversed, 63%–37%, in favor of VPC. There were no sales by Heatransfer to VWSC of any Heatransfer units after June, 1971, when their relationship was terminated.

The last Volkswagen distributor in the United States to do business with Heatransfer was Import Motors in Grand Rapids, Michigan, but sales fell when the distribu-

tor refused to install Heatransfer units in Volkswagens at its port facility. The relationship with Import Motors was terminated in June, 1972. After this time, Heatransfer continued to do business with franchised dealers on a direct basis, but the lack of access to distributors made it increasingly difficult to sell to VWoA's franchised dealers.

Lende next attempted to develop the "after market" for Volkswagen air-conditioners. This term is used for the market consisting of cars originally sold by dealers without air-conditioners. There was little competition in this market for air-conditioners for Volkswagens and Lende received favorable response from both Sears Roebuck Company and J. C. Penney Company, two large retailing chains. The after market, however, was still not sufficient to sustain Heatransfer.

Lende also tried to push the Heatransfer unit on the foreign market, and met with some initial success. For example, he went to Brazil in late 1969, and secured an order for a shipment of Heatransfer units. After correspondence from VWAG to the purchaser, however, no additional Brazilian orders were forthcoming. We reproduce that correspondence in the margin.[9]

The best foreign market for Volkswagen air-conditioners appeared to be Japan, where the Heatransfer unit could fit Japan's right-hand drive vehicles without any major design change. In 1971, the Volkswagen importers in Japan bought 400 units from Heatransfer, and this amount increased to 1200 units in 1972. In 1973,

however, sales dropped by 50% when the Japanese importer began purchasing VPC's newly designed right-hand drive unit.

Because of the continuing marketing problems, Lende and his associates decided in 1974 to liquidate Heatransfer Corporation.

## IV. UNLAWFUL TYING

A tying arrangement, generally stated, is an agreement by which one party agrees to sell a product (the tying product), but only upon condition that the buying party also purchases another product (the tied product) which the buyer would ordinarily not purchase, where the effect is to substantially lessen competition. *Northern Pacific Railway Co. v. United States,* 356 U.S. 1, 5–6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545, 549–550 (1958). In *Northern Pacific,* the Supreme Court stated:

> [Tying agreements] are unreasonable in and of themselves whenever a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product and a "not insubstantial" amount of interstate commerce is affected. *International Salt Co. v. United States,* 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20; Cf. *United States v. Paramount Pictures,* 334 U.S. 131, 156–159, 68 S.Ct. 915, 928–929, 92 L.Ed. 1260; *United States v. Griffith,* 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236. Of course where the seller has no control or dominance over the tying

---

9. *Translation of letter from Volkswagenwerk A.G.*

> December 17, 1969
>
> *Airconditioner for VW 1300*
>
> Dear Mr. Scholz:
>
> We take reference to your letter number 223 of November 19th to Mr. Quinn, subject airconditioners for VW 1300.
>
> A few months ago we already informed you that we are developing airconditioners in close cooperation with Delanair in the United States. In the interim Delanair has been acquired by Volkswagen of America and continues under the name of Volkswagen Products Corporation. Mr. Schlager is in charge of the company.

> Because of your above letter we inform you of this and would like to suggest that you contact Mr. Schlager before carrying out tests with airconditioners of Heat Transfer Corporation because as far as we know such evaluations have already been carried out there. As Delanair belongs now to the combine we would suggest that all your problems are communicated to Delanair which certainly now is most interested to also assist you in this matter either from the United States or possibly with manufacturing in the country.
>
> VOLKSWAGENWERK, A.G.
>
> H. J. Radok

product so that it does not represent an effectual weapon to pressure buyers into taking the tied item any restraint of trade attributable to such tying arrangements would obviously be insignificant at most. As a simple example, if one of a dozen food stores in a community were to refuse to sell flour unless the buyer also took sugar it would hardly tend to restrain competition in sugar if its competitors were ready and able to sell flour by itself.

356 U.S. at 6–7, 78 S.Ct. at 518–519, 2 L.Ed.2d at 550.

The Court then determined what was to be considered sufficient economic power of the seller to make the tying agreement an illegal one:

While there is some language in the *Times-Picayune* [*Publishing Co. v. U. S.*, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277], opinion which speaks of "monopoly power" or "dominance" over the tying product as a necessary precondition for application of the rule of *per se* unreasonableness to tying arrangements, we do not construe this general language as requiring anything more than sufficient economic power to impose an appreciable restraint on free competition in the tied product (assuming all the time, of course, that a "not insubstantial" amount of interstate commerce is affected).

Id. at 11, 78 S.Ct. at 521, 2 L.Ed.2d at 553. See *Broussard v. Socony Mobil Oil Co.,* 350 F.2d 346 (5th Cir. 1965).

■ Thus, for a tying arrangement to be a violation of Section 1 of the Sherman Act [10] (as well as Section 3 of the Clayton Act, although a violation of that section of the Clayton Act is not presented to us on appeal) it must be shown that (1) the seller has sufficient economic power over the tying product, e. g., monopoly, market dominance, etc., to induce his customer, through economic leverage, to purchase the tied product along with the tying product, and (2) a not insubstantial amount of commerce in the tied product is restrained as a result. See *Sulmeyer v. Coca Cola Company,* 515 F.2d 835, 844 (5th Cir. 1975), cert. denied, 424 U.S. 934, 96 S.Ct. 1148, 47 L.Ed.2d 341.

In answers to written questions, the jury in the present case found, from what it believed to be a preponderance of the evidence, that the provisions of the Volkswagen dealer and distribution franchise agreements constituted tying agreements under Section 1 of the Sherman Act. It further found that such agreements were not necessary to preserve the goodwill of the defendants.

■ It is well established that tying arrangements are illegal *per se*. See, e. g., *Fortner Enterprises, Inc. v. United States Steel Corp.,* 394 U.S. 495, 89 S.Ct. 1252, 22

---

10. The Sherman Act, § 1, 15 U.S.C. § 1, reads:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal: *Provided,* That nothing contained in sections 1 to 7 of this title shall render illegal, contracts or agreements prescribing minimum prices for the resale of a commodity which bears, or the label or container of which bears, the trademark, brand, or name of the producer or distributor of such commodity and which is in free and open competition with commodities of the same general class produced or distributed by others, when contracts or agreements of that description are lawful as applied to intrastate transactions, under any statute, law, or public policy now or hereafter in effect in any State, Territory, or the District of Columbia in which such resale is to be made, or to which the commodity is to be transported for such re-

sale, and the making of such contracts or agreements shall not be an unfair method of competition under section 45 of this title: *Provided further,* That the preceding proviso shall not make lawful any contract or agreement, providing for the establishment or maintenance of minimum resale prices on any commodity herein involved, between manufacturers, or between producers, or between wholesalers, or between brokers, or between factors, or between retailers, or between persons, firms, or corporations in competition with each other. Every person who shall make any contract or engage in any combination or conspiracy declared by sections 1 to 7 of this title to be illegal shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding fifty thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court.

L.Ed.2d 495 (1969); *Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958); *Miller v. Granados*, 529 F.2d 393 (5th Cir. 1976); *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.*, 549 F.2d 368 (5th Cir. 1977). That is to say, there are "certain categories of business arrangements . . [which] exhibit a high likelihood of anticompetitive impact and offer virtually no prospect at all of enhancing competition. With respect to such arrangements, antitrust plaintiffs need not demonstrate unreasonableness; the conduct constitutes a *per se* violation of the Sherman Act. . . . The *per se* label indicates that a plaintiff need not demonstrate that the effects of the tie are unreasonable. Indeed, not only is the plaintiff relieved from establishing that the effects are unreasonable, but in addition the defendant is not free to demonstrate that the effects are reasonable or even affirmatively desirable". *Kentucky Fried Chicken, supra*, at 374–375. Of course this is not to say that the plaintiff is relieved from establishing that a tie-in has actually occurred. Lawful arrangements by any other name do not thereby become unlawful.

Appellants assert that there is nothing in the best efforts clauses in their franchise agreements on which to base a finding of an illegal *per se* tying agreement. Those agreements contain provisions requiring the franchisee to use his "best efforts" to promote Volkswagen automobiles, parts, and accessories.[11] Looking at the "best efforts" clauses in isolation, as appellants would have us do, we would tend to agree with this view. But our duty is to look at the circumstances surrounding the use of these clauses to determine if violations of the antitrust laws occurred. "The presence of the illegal condition may be inferred from an extrinsic course of conduct supplementing the written contract". *Advance Business Systems & Supply Co. v. S.C.M. Corporation*, 415 F.2d 55, 64 (4th Cir. 1969), cert. denied, 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 101.

Initially, we reject appellant's argument that the court's charge to the jury allowed a finding of tying on the basis of the best efforts provisions standing alone. We view the court's tying arrangement instruction as sufficient to direct the jury to consider the means by which the provisions were enforced.[12]

---

**11.** For example, Plaintiff's Exhibit (PE)—142, Volkswagen Distributor Agreement, Article 6(1) provides: "Distributor will use its best efforts to promote the sale of VW Automobiles in the Territory through such means as may be specified from time to time by Directives and Suggestions."; and Article 7(1): "Distributor will use its best efforts to promote the sale of VW Parts in the Territory through such means as may be specified from time to time by Directives and Suggestions."

**12.** The trial court's charge to the jury on tying was as follows:

A tying arrangement exists when a seller refuses to sell one product except on the condition that the buyer also purchase from the seller some other product, or service, which the buyer does not need or want, where the effect may be to substantially lessen competition. Tying arrangements are considered to be naturally anti-competitive since they deny free access to the market for the unwanted product, not because the party imposing the tying arrangement has a better product or a lower price, but because it has the power to force a product upon the purchaser. To constitute an illegal tying agreement, however, it is not enough that the seller simply possess economic power. That power must have been used to force the purchase of some unwanted product. There can be no illegal tie unless unlawful conduct by the seller influences the buyer's choice. For an antitrust violation, it is not necessary that the tying arrangement force a purchaser to buy only the product of the seller, but only that the amount of trade foreclosed by the agreement is more than merely insubstantial.

Moreover, a manufacturer may require its distributor to promote to customers all its products so long as the purchase of one product of the manufacturer is not tied to the purchase of another of the manufacturer's products.

Plaintiff alleges that the provisions of the distributor and dealer agreements and their interpretation by VWOA imposed the requirement on the distributors and dealers to purchase reasonable inventories of first Delanair and then VPC air conditioners and to promote the sale of these air conditioners, regardless of whether the distributors and dealers in fact wished to buy these VWOA approved air conditioners on the basis of the merits of the Delanair-VPC air conditioner

It is obvious that VWoA had sufficient economic power in the tying product, Volkswagen automobiles, to "strongly urge" Volkswagen distributors and dealers to purchase VWoA approved parts, the tied product. It is also obvious that more than an insubstantial amount of interstate commerce was affected. See *Fortner Enterprises, Inc. v. United States Steel Corp.*, 394 U.S. 495, 501–502, 89 S.Ct. 1252, 1258, 22 L.Ed.2d 495, 503–504 (1969).

■ We held in a recent case that "it is not enough to show that the seller has sufficient economic power and that two products were purchased together. In addition, it must be shown that the purchaser was coerced into purchasing an unwanted product." *Response of Carolina, Inc. v. Leasco Response, Inc.*, 537 F.2d 1307, 1327 (5th Cir. 1976). But *Leasco* involved a suit by franchisees against a franchisor claiming antitrust violations. In that type of action, a party to a contract is alleging that the contract is being illegally enforced against it or is illegal on its face. Courts are understandably reluctant to find such contracts

to be illegal absent a fairly strong showing of coercion. In cases like the one at bar, on the other hand, an independent supplier to the franchisees asserts harm to it because of antitrust violations by the franchisor. The fact of coercion appears less important in this situation then the fact of foreclosure. If franchisees are coerced or "persuaded" to buy goods which they otherwise would not buy, with the result being tremendous lessening of the market in which a competitor sells his product, such a showing is sufficient to submit the question of a Section 1 antitrust violation to the jury.

■ We think the evidence as a whole, including correspondence and memoranda from Guenter Kittel, Vice President of VWoA at the time, and VPC records, provided ample basis for a jury to find that distributors and dealers, as a result of the best efforts clauses as enforced,[13] were urged to stock the Delanair/VPC air-conditioner, even though the franchise agreement, on its face, allowed the purchase of other units. We indicate the source of this evidence in the margin.[14] It is too volumi-

when compared to the merits of the competing brands. The defendants deny this allegation saying that they have never required Volkswagen distributors and dealers to purchase Delanair-VPC air conditioners as a condition to purchasing Volkswagen automobiles. Second, they allege that they have never enforced the provisions of the distributor and dealer agreements relating to the promotion of approved parts and accessories and that they have never used any economic power to force distributors or dealers into buying Delanair-VPC air conditioners. On the contrary, defendants contend, as a practical matter, Volkswagen distributors and dealers have always been free to purchase any brand of air conditioner they desire.

Therefore, you must consider if, based on the evidence you have heard, it is more likely than not that Volkswagen distributors and dealers have purchased Delanair-VPC air conditioners because VWOA required them to do so as a condition to their also purchasing Volkswagen automobiles.

Even if you find the existence of a tying agreement, no violation of Section 1 of the Sherman Act should be found if you find such arrangement was reasonably necessary to protect the goodwill of the Volkswagen vehicles or trademarks. The protection of goodwill is a reasonable basis to justify an

otherwise unlawful tying agreement. To establish this defense, the defendants have the burden to show that these provisions were reasonably necessary to assure that the products identified by the Volkswagen trademarks were available at the places identified by such trademarks to assure adequate service and parts to such products, or to provide quality products.

If you have found that a tying arrangement exists but that the provisions of the franchise agreement were reasonably necessary to protect the defendants' goodwill, then you cannot find that the provisions of the franchise agreement violated Section 1. On the other hand, if you found that a tying arrangement exists and if you believe that these provisions were not reasonably necessary to protect Volkswagen's goodwill, then you must find a violation of Section 1.

13. It is necessary to determining whether the persuasion or coercion was a product of enforcement of the best efforts clauses since the tying violation found by the jury, in answer to Interrogatory # 1, specifically referred to the best efforts clauses (distributor franchise agreements). See footnote 1, *supra.*

14. The following sources are not all inclusive, but furnish ample evidence for a jury to find the existence of antitrust violations: Guenter

nous to reproduce in full. That same evidence also appears to us a sufficient basis upon which a jury could reject the appellants' defense that the tying arrangement was necessary to preserve the goodwill of defendants.

■ It is of course not our holding that all best efforts clauses are violations *per se* of the antitrust laws, but we find that an inquiry into the circumstances surrounding the best efforts clauses and their implementation in the present case sufficiently raised in this respect significant questions for jury determination. We view the record as supporting the jury's finding that the best efforts clauses here, as implemented, were tying arrangements of the type which the antitrust laws were designed to prevent, and, as such, were *per se* violations of Section 1 of the Sherman Act.

## V. CONSPIRACY IN RESTRAINT OF TRADE

■ In answer to written interrogatories [15] the jury found that VWoA, VWAG and VPC were part of a conspiracy to restrain trade in violation of Section 1. We have already determined that there was sufficient evidence for the jury to find that the franchise agreement best efforts clauses of VWoA were tying arrangements that unreasonably restrained trade. In our discussion of the acquisition of Delanair, infra, we, likewise, find sufficient evidence to uphold the jury's finding of an antitrust violation which tended to restrain trade. These are two clear indicia of conspiring to restrain trade. In addition, the proof that VPC and VWoA arranged to pre-air condition a substantial percentage of cars at port installation centers before delivering those cars to dealers was evidence of a conspiracy to restrain trade. Further the evidence showed that certain dealers would not carry the Heatransfer unit because it was not approved by VWoA

for reasons, it appeared, other than performance. Officials of VWAG and of VPC, the evidence showed, met several times to coordinate the development of the Volkswagen vehicles and the VPC air-conditioning unit. The competition was excluded from these meetings and was denied the information disclosed there.

■ Additionally, several memoranda were submitted in evidence, from which the jury could find attempts to restrain trade. However in view of the fact that we have found ample evidence in the record to show that the best efforts clause, as implemented, was a *per se* violation, it is unnecessary to further analyze the evidence to determine whether there was shown to have been an unreasonable restraint of trade. This is so since a *per se* violation is *ipso facto* an unreasonable restraint of trade.

## VI. RELEVANT MARKET OFFENSES

### A. *Relevant Market*

In *United States v. E. I. duPont de Nemours Co.*, 351 U.S. 377, 393, 76 S.Ct. 994, 1006, 100 L.Ed. 1264 (1956), the Supreme Court stated that "[s]ection 2 [16] requires the application of a reasonable approach in determining the existence of monopoly power . . . ." Thus, before it can be determined whether a monopoly exists it must be determined what the relevant market in the present case is.

■ Relevant market is essentially a question of fact, so that findings concerning this subject should be overturned on appeal only if clearly erroneous, or where there is a dearth of evidence to support the finding below. See *Yoder Brothers, Inc. v. California-Florida Plant Corp.*, 537 F.2d 1347, 1366 (5th Cir. 1976); *Sulmeyer v. Coca Cola Co.*, 515 F.2d 835, 849 (5th Cir. 1975), cert. denied, 424 U.S. 934, 96 S.Ct. 1148, 47 L.Ed.2d 341; *Telex Corporation v. International Business Machines Corp.*, 510 F.2d 894, 915

Kittel memoranda—Plaintiff's Exhibits 98, 100, 104, 117, 264, 638; VPC sales reports, etc.— Plaintiff's Exhibits 9, 35–41; R. pp. 199–208, 3074–3077, 3533–3539, 3714–3719, 3746–3749, 4615–4618.

**15.** See Questions 3, 4 and 5, note 1, *supra*.

**16.** Of the Sherman Act.

(10th Cir. 1975) cert. dismissed, 423 U.S. 802, 96 S.Ct. 8, 46 L.Ed.2d 244.

Relevant market may be defined on the basis of geographical boundaries of the market, *Indiana Farmer's Guide Co. v. Prairie Farmer Pub. Co.*, 293 U.S. 268, 55 S.Ct. 182, 79 L.Ed. 356 (1934), and on the basis of product differentiation, *United States v. E. I. duPont de Nemours & Co., supra.* We are concerned with the latter on this appeal. The Supreme Court has stated that "[t]he outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it. However, within this broad market, well-defined submarkets may exist which, in themselves constitute product markets for antitrust purposes. *United States v. E. I. duPont de Nemours & Co.*, 353 U.S. 586, 593–595, 77 S.Ct. 872, [877–878], 1 L.Ed.2d 1057, [1066–1068]. The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325, 82 S.Ct. 1502, 1523–1524, 8 L.Ed.2d 510, 535–536 (1962).

If the relevant market is, as appellants argue, air-conditioners for all automobiles or, at the very least, for small foreign automobiles, the violations found by the jury, based on the relevant market encompassing only VWoA imported cars, must be overturned. If, however, appellees submitted sufficient evidence to support their view of what comprised the relevant market, we should not disturb that finding. We will attempt a brief review of the evidence submitted.

It seems from the record that the major competitors for the Volkswagen air-conditioning market were DPD, Meierline, Heatransfer, and Delanair/VPC. Indeed, this was found to be so when appellants conducted a study of Delanair shortly before that company was acquired by appellants. See Plaintiff's Exhibit 7, Acquisition Audit of Delanair Engineering Company, p. 7. With few exceptions, these companies produced air-conditioning units almost exclusively for VWoA import cars, concentrating on this market because of the distinct engineering problems associated with the Volkswagen imports. Further, up until the time of trial in this case, these four competitors were the sole suppliers of air-conditioners for VWoA.

While Heatransfer developed an air-conditioning unit for the Opel, it never sold units to any company save VWoA and VWAG, or their distributors. Meierline and DPD did sell units to other automobile manufacturers besides VWoA, but these sales were insignificant compared to sales to VWoA. During its first three years in business, Delanair sold some 2,670 air-conditioning units for installation in vehicles other than VWoA imports. This amounted to about 10% of Delanair's total sales during that period. By its third year in operation, however, from the time it first became profitable, Delanair "sold air-conditioners almost exclusively for installation in Volkswagen vehicles". Plaintiff's Exhibit 7, p. 5. VPC, although it made prototypes for other automobiles, has never actually sold air-conditioners to any other manufacturers. All these things are supportive, *vis-a-vis Brown Shoe*, of the jury's finding as to the relevant market.

Appellants argue that such cases as *Telex Corp. v. International Business Machines Corp., supra, Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 512 F.2d 1264 (9th Cir. 1975), and *ITT Corp. v. GTE Corp.*, 518 F.2d 913 (9th Cir. 1975), support their argument that the relevant market should be broader than that determined by the jury. Those cases deal with the adaptability or substitutability of products, and contain nothing that persuades us to overturn the finding of the reply to Question 6 that the relevant market in considering Section 2 of the Sherman Act was the manufacture and sale of air-conditioners for only Volkswagen, Porsche and Audi auto-

mobiles throughout the world. We have carefully perused the briefs in this case and the relevant records and exhibits. As we understand the points of contention, we cannot find, as a matter of law, that the jury's factual finding as to relevant market was not supported by the evidence. See *Sulmeyer v. Coca Cola Co., supra,* 515 F.2d at 849.

**B.** *Unlawful Monopolization, Attempt to Monopolize, and Conspiracy to Monopolize*

▮ Having approved the jury's finding as to the relevant market, we consider the proof as to the unlawful monopolization, attempt to monopolize, and conspiracy to monopolize charges. Under Section 2 of the Sherman Act [17] the offense of monopoly has two elements: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident". *United States v. Grinnell Corporation,* 384 U.S. 563, 570–571, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778, 786. Once the relevant market has been determined, the existence of monopoly power "ordinarily may be inferred from the predominant share of the market". Id. at 571, 86 S.Ct. at 1704, 16 L.Ed.2d at 786. The evidence in the record appears to support appellee's estimate that appellants' market

control was between 71%–76% during the years 1971–1973. See Plaintiff's Exhibits 9–10; R. pp. 1907–1912, 1929–1930. Such a share of the relevant market is sufficient to establish a monopoly power. See *United States v. E. I. duPont de Nemours & Co.,* 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956); *United States v. United Show Machinery Corp.,* 110 F.Supp. 295 (D.Mass. 1953), aff'd per curiam, 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910 (1954).

▮ The willful acquisition or maintenance of the monopoly power can be demonstrated by "conduct designed to barricade access to markets or inhibit production . . ." *Woods Exploration & Producing Company, Inc. v. Aluminum Company of America,* 438 F.2d 1286, 1307 (5th Cir. 1971), cert. denied, 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736. We have already upheld the jury's verdict finding the existence of a tying agreement. This in itself is substantial evidence of narrowing access and prohibiting production. Our affirmance, infra, of the violation of Section 7 of the Clayton Act, through the acquisition of Delanair and Intercontinental Motors, is further supportive of the finding by the jury that the monopoly power was willfully attained.

**C.** *Acquisition of Delanair and Intercontinental Motors*

The jury found that appellants violated Section 7 of the Clayton Act [18] by acquiring

---

**17.** The Sherman Act, § 2, 15 U.S.C. § 2, reads:

Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding fifty thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court.

July 2, 1890, c. 647, § 2, 26 Stat. 209; July 7, 1955, c. 281, 69 Stat. 282.

**18.** The Clayton Act, § 7, 15 U.S.C. § 18, reads in pertinent part:

No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction

of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.

No corporation shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of one or more corporations engaged in commerce, where in any line of commerce in any section of the country, the effect of such acquisition, of such stocks or assets, or of the use of such stock by the voting or granting of proxies or otherwise, may be substantially to lessen competition, or to tend to create a monopoly.

Delanair and Intercontinental Motors. A violation of Section 7 occurs when a corporation acquires the whole or any part of another corporation also engaged in commerce, where "the effect of such acquisition may be substantially to lessen competition, or tend to create a monopoly."

The Supreme Court has stated that "[d]etermination of the relevant market is a necessary predicate to a finding of a violation of the Clayton Act because the threatened monopoly must be one which will substantially lessen competition 'within the area of effective competition'. Substantiality can be determined only in terms of the market affected." *United States v. E. I. duPont de Nemours & Co.,* 353 U.S. 586, 593, 77 S.Ct. 872, 877, 1 L.Ed.2d 1057, 1067 (1957). We have already upheld the jury finding that relevant market in this case was air-conditioning units for Volkswagen vehicles. Our present task is only to determine whether there was sufficient evidence upon which a jury could find that the effect of the acquisition may have been substantially to lessen competition, or to tend to create a monopoly.

■ Volkswagen air-conditioning units were sold mainly through the efforts of VWoA and the regional distributors. By acquiring Delanair, one of the manufacturers competing for VWoA business, it was shown that VWoA, while not formally forbidding dealers and distributors from buying other air-conditioning units, had severely limited the chance of VWoA approval of any other unit, thus curtailing the marketability of those other units. It was further shown that following the acquisition of Delanair, that company, doing business as VPC, substantially increased its sales in a short period of time. See Plaintiff's Exhib-

its, 7, 8, 618A. Also, for times relevant to this trial, testimony and evidence was presented, already discussed, which supported a finding of VPC's subsequent dominance of the market to well over 70%. After the acquisition of Intercontinental Motors, sales of the VPC unit increased markedly (see discussion under The Facts, Part III of this opinion, *supra* ), to the detriment of other suppliers. The composite effect of this evidence, together with other evidence substantiating the Section 7 violation, persuades us that there was sufficient evidence for the jury to conclude—as it did—that the acquisitions substantially foreclosed competition. See *Ford Motor Company v. United States,* 405 U.S. 562, 92 S.Ct. 1142, 31 L.Ed.2d 492 (1972).

## VII. FAILING COMPANY DEFENSE

The jury rejected the appellants' defense that Delanair was a failing company and hence that the acquisition of it by VWoA did not violate Section 7, pursuant to *International Shoe Co. v. FTC,* 280 U.S. 291, 50 S.Ct. 89, 74 L.Ed. 431 (1930). In *International Shoe,* the corporation involved had its "resources so depleted and the prospect of rehabilitation so remote that it faced the grave probability of a business failure . . . ." Id. at 302, 50 S.Ct. at 93, 74 L.Ed. at 443. But in *Citizen Publishing Co. v. United States,* 394 U.S. 131, 89 S.Ct. 927, 22 L.Ed.2d 148 (1969), the Court added a further requirement to use of the failing company doctrine:

"The failing company doctrine plainly cannot be applied in a merger or in any other case unless it is established that the company that acquires the failing company or brings it under dominion is the only available purchaser. For if another person or group could be interested, a unit in

This section shall not apply to corporations purchasing such stock solely for investment and not using the same by voting or otherwise to bring about, or in attempting to bring about, the substantial lessening of competition. Nor shall anything contained in this section prevent a corporation engaged in commerce· from causing the formation of

subsidiary corporations for the actual carrying on of their immediate lawful business, or the natural and legitimate branches or extensions thereof, or from owning and holding all or a part of the stock of such subsidiary corporations, when the effect of such formation is not to substantially lessen competition.

the competitive system would be preserved and not lost to monopoly power." Id. at 138, 89 S.Ct. at 931, 22 L.Ed.2d at 156.

Delaney-Gallay, the parent company of Delanair, made an attempt to sell Delanair to DPD, but that plan fell through. Subsequently, of course, Delanair was purchased by VWoA. There is nothing in the record that supports the theory that Delanair would collapse but for the acquisition. Indeed, the major reason for getting rid of Delanair appeared to be the desire of Delaney-Gallay to get it off the company books before the end of the fiscal year. This rush factor also discounts viewing VWoA as the only possible purchaser. The evidence disclosed no affirmative effort to sell Delanair on the open market.

■ We find nothing which persuades us to reverse the jury's verdict for appellee in this respect. Indeed, we find ample support in the record for the verdict's rejection of the failing company defense.

## VIII. CAUSATION AND DAMAGES

### A. *Causation*

■ Initially, we address the question of causation, for affirmance of the award of damages to appellee certainly cannot stand absent a finding that appellants' actions were the proximate cause of the damages sustained. The record supports the jury's finding that Heatransfer sustained injury to its business caused by appellants' violations of the antitrust laws, already discussed at length in this opinion. Appellants attempted to show that any damages suffered by appellee were suffered solely because of various shortcomings on the part of appellee, including less than adequate product, lack of perseverance, and haphazard sales efforts. But these contentions were amply rebutted in each particular by appellee's proof. Therefore, no basis exists for us to determine as a matter of law that the evidence did not support the jury's finding of causation. See *Keogh v. Chicago & N. W. Ry. Co.*, 260 U.S. 156, 165, 43 S.Ct. 47, 50, 67 L.Ed. 183, 188–189 (1922); *M. C. Manufacturing Co. v. Texas Foundaries,*

*Inc.*, 517 F.2d 1059 (5th Cir. 1975), cert. denied 424 U.S. 968, 96 S.Ct. 1466, 47 L.Ed.2d 736.

### B. *Damages*

Appellee presented two theories at trial in an attempt to project its damages as a result of lost sales. Method I assumed that, absent any antitrust violations, Heatransfer would have had the same sales through the damage period, relative to VPC sales, as it experienced in the pre-damage, or base, period, relative to Delanair/VPC. The trial court instructed the jury to disregard Method I, for VPC sales would have included presumptively the sales lost by Heatransfer, Meierline, and DPD, because of appellants' antitrust violations.

Method II, the theory upon which the jury based its findings as to damages, relied on four assumptions relative to the finding of lost sales: (1) that plaintiff suffered damages; (2) that the damage period extended from November 1969, through December 1973; (3) that the base period, that is, the period when there was no impediment to competition, extended from June 1969, through October 1969; and (4) that Heatransfer would have produced and marketed air-conditioning units for Volkswagen Types 2, 3 and 4 and for the Audi during the damage period. Three further assumptions upon which Method II was premised, relative to the actual calculation of damages, were as follows: (1) Delanair sales would have declined at a constant rate but for the anti-competitive activity; (2) the relative market shares of Heatransfer, DPD, and Meierline would have remained constant; and (3) Heatransfer would have captured the same market shares for units manufactured for other types of Volkswagen vehicles.

■ This Court stated in *Kestenbaum v. Falstaff Brewing Corp.*, 514 F.2d 690, 695 (5th Cir. 1975), cert. denied, 424 U.S. 943, 96 S.Ct. 1412, 47 L.Ed.2d 349: "We recognize that leniency should be permitted in showing damages in private antitrust actions, however, a damage assessment based wholly on speculation and guesswork is improp-

er." We do not find these assumptions so speculative as to render the damages judgment based upon them unfounded. All such assumptions were supported by the record as exemplified by the testimony and exhibits.[19] Aside from the margin references and the evidence previously discussed, this opinion would be extended unnecessarily if we explored the evidence in detail and at further depth. We add simply that there was ample evidence to dispel any concern that the jury's determination, based on the given assumptions, was the result of guesswork and speculation.

Having concluded that the assumptions upon which the jury based its findings of damages were valid, it is appropriate to direct our scrutiny to that finding itself. Utilizing Method II, the already mentioned appellee's expert witness testified that he projected that Heatransfer would have sold 87,000 units over the damage period absent the antitrust violations. These sales, he testified, would have yielded approximately $2.1 million in net profits before taxes for Heatransfer. Thus, $2.1 million in profits were lost because of the antitrust violations. Further, because of loss of those net profits, the expert witness calculated that there would be a concomitant loss to capital value of approximately $3.5 million. It was from these figures that the jury fashioned its damage award of $5 million.

In *Bigelow v. R. K. O. Radio Pictures, Inc.,* 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946), the Court observed that a plaintiff in a treble damage case need not prove damages with the exactness which would have been possible under freely competitive conditions. "The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created". Id. at 265, 66 S.Ct. at 580, 90 L.Ed. at 660. Once it has been shown that

damages have resulted, it is only necessary that plaintiff present reasonable evidence as to the amount of those damages. Such a showing was made in the present case, and we are unwilling to substitute our concept of damages for the judgment made by the jury and upheld by the trial court. See *Hobart Brothers Co. v. Malcolm T. Gilliland, Inc.,* 471 F.2d 894, 902 (5th Cir. 1973), cert. denied, 412 U.S. 923, 93 S.Ct. 2736, 37 L.Ed.2d 150.

In a recent Supreme Court decision, *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977), the question presented to the Court was "whether antitrust damages are available where the sole injury alleged is that competitors were continued in business, thereby denying respondents an anticipated increase in market shares." Id. at 484, 97 S.Ct. at 695, 50 L.Ed.2d at 709. In *Brunswick,* the petitioner, one of the two largest manufacturers and distributors of bowling equipment in the United States, found that it was owed more than $400 million for equipment supplied on extended credit terms. To get necessary cash, the corporation began to repossess some equipment and sell it to third parties. Where such sales were not feasible, petitioner would take over the bowling centers and operate them itself. Six of the bowling centers that petitioner began operating were in competition with respondents' bowling centers.

Respondents sued, alleging that the acquisitions by petitioner might substantially lessen competition or tend to create a monopoly in violation of Section 7 of the Clayton Act. Respondents' damage theory put forth the argument that but for Brunswick's acquisition of the six bowling centers, those centers would have gone out of business, leaving their customers to respondents. Respondents argued therefore that

---

19. There was, for example, evidence of Delanair's continued decline; of the growing dissatisfaction with the Delanair unit, with no sign of improvement; there was no evidence of new entrants into the market, so as to dispel evidence that market share would remain the same; there was evidence regarding the merits and weaknesses of the different competing units, there was also evidence that Heatransfer would have produced and marketed air-conditioning units for Volkswagen Types 2, 3, 4, and Audi during the damage period, and had, in fact, begun to design units for Types 2 and 3.

their injury was measured by the profits lost due to petitioner's acquisition of the six bowling centers.

The trial court allowed this theory to be submitted to the jury as a basis for finding damages. The Court of Appeals found no basic fault with the theory of damages but remanded stating that respondent must prove that the bowling centers would, in fact, have failed.

The Supreme Court saw some difficulty in "intermeshing" Section 7, which prohibits certain acts with a potential to cause harm, with Section 4, which attempts to remedy such harms.

Plainly, to recover damages respondents must prove more than that petitioner violated § 7, since such proof establishes only that injury may result. Respondents contend that the only additional element they need demonstrate is that they are in a worse position than they would have been had petitioner not committed those acts. The Court of Appeals agreed, holding compensable any loss "causally linked" to "the mere presence of the violator in the market." NBO Industries Treadway Companies v. Brunswick Corp., 523 F.2d [262], at 272–273 [3 Cir.]. Because this holding divorces antitrust recovery from the purposes of the antitrust laws without a clear statutory command to do so, we cannot agree with it.

Every merger of two existing entities into one, whether lawful or unlawful, has the potential for producing economic readjustments that adversely affect some persons. But Congress has not condemned mergers on that account; it has condemned them only when they may produce anticompetitive effects. Yet under the Court of Appeals' holding, once a merger is found to violate § 7, all dislocations caused by the merger are actionable, regardless of whether those dislocations have anything to do with the reason the merger was condemned. This holding would make § 4 recovery entirely fortuitous, and would authorize damages for losses which are of no concern to the antitrust laws.

Id. at 486–487, 97 S.Ct. at 696–697, 50 L. Ed.2d at 711.

The Supreme Court thus held that for respondents to recover treble damages because of a Section 7 violation, they must prove more than a causal link to an illegal presence in the market. They must prove antitrust injury, "which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation". Id. at 489, 97 S.Ct. at 697, 50 L.Ed.2d at 712.

In the present case, the violations allegedly caused by VWoA's acquisition of Delanair go beyond the causal link rejected by the Supreme Court in Brunswick. In Heatransfer, the acquisition of Delanair did more than merely keep Heatransfer and other competitors from gaining sales that would have resulted had Delanair continued to decline. There was substantial evidence presented that by acquiring Delanair, VWoA virtually precluded any of the competitors in the Volkswagen air-conditioning unit market from openly competing with the VWoA company. Theoretically, if Delanair had been acquired by any other company, save VWoA, the market would still be open to competition. By acquiring Delanair itself, VWoA had an uncontested financial interest in the success of the newly acquired company. It was to VWoA's advantage to deal as much as possible with VPC/Delanair to the exclusion of other competitors—and competition. Such a consequence is surely an antitrust injury that reflects "the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation". Brunswick, supra. It is "the type of loss that the claimed violations of the antitrust laws would be likely to cause". Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 125, 89 S.Ct. 1562, 1577, 23 L.Ed.2d 129, 149 (1969).

We come finally to appellants' contention that it is flagrantly inconsistent for appellee to argue that Delanair was not a failing company. Heatransfer counters that it "merely assumed that the acquired company had been fairly beaten and would continue to decline as a market force. It was absolutely not assumed that Delanair would somehow have evaporated or gone into liquidation as of the date of acquisition or anytime during the damage period". Appellee's Supp.Br., p. 14.

 It is sound principle to require that a plaintiff seeking damages not put forth proof of damages inconsistent with the proof utilized to establish an antitrust violation. Thus, it would be inconsistent, and unacceptable, to allow a plaintiff to establish that a failing company defense was not applicable to the acquiring company, while at the same time proving, as a necessary element of some sort of damage claim, that the acquiring company would have failed but for the acquisition by defendant. See Areeda, Antitrust Violations Without Damage Recoveries, 89 Harv.L. Rev. 1127, 1132–1133, n. 4 (1976).

 In this case, however, appellee did not argue, nor did it prove, that Delanair was a failing company. As we have discussed previously, a failing company, for the purposes of asserting that status as a defense to an otherwise illegal acquisition, is one where resources are so depleted and chances of rehabilitation so remote that business failure is all but a foregone conclusion. To defend the acquisition of such a company by a company which would otherwise be violating antitrust laws, it is further necessary to show that the acquiring company was the sole available purchaser. None of these elements was proved in the present case. Appellee merely asserts that Delanair's downward trend would have continued, to the advantage of other competitors. This is not inconsistent with a rejection of the failing company defense.

 The damage computations were heatedly opposed and attacked by defendants in the several briefs they submitted to this Court. After careful review of their objections we find no basis for us to overturn the jury finding on the question of damages. The essential damage element questions not already addressed by us were substantially reviewed by the court below in its consideration of appellants' motion for judgment n. o. v. or for a new trial. We adopt those views and reproduce them in the margin.[20]

20. [*Plaintiff's Market Share*]
 Defendants attack the jury's assumption that Heatransfer's portion of the total sales relative to the other competitors would have remained constant during the damage period but for the unlawful activities of the defendants. They allege that such an assumption is speculative and contrary to the evidence because it fails to consider new entrants into the market and because it fails to take into account the sales Heatransfer would have lost to DPD.
 The assumption that Heatransfer's market share would remain constant is not contrary to the evidence. First, there is no evidence of any potential new entrants into the market. Second, although there is some evidence to the effect that the relationship between DPD and Heatransfer changed with regard to their respective market shares, there is also evidence that this was the result of the newer company's inability to establish itself because of the defendants' anti-competitive practices. Furthermore, during the course of the trial, the jury was presented evidence regarding methods of marketing, the merits and weaknesses of each individual competitor's product, the trends developing within the market, etc. It cannot be said that the inference that plaintiff's sales would have remained constant was made by the jury without a proper consideration of market conditions. Accordingly, the jury's determination to infer that the market shares of each competitor would remain constant cannot be said to be contrary to the evidence or to rest on speculation and guesswork.
 [*New Products*]
 Defendants also challenge the sufficiency of evidence to support the jury's assumption that plaintiff would have had the same success in marketing units for other models as it had in marketing its Type I unit. Although the evidence to support this assumption is not extensive, it is supported by the testimony of Bill Lende who testified that it was necessary to have a full line of air conditioners for the Volkswagen family in order to sell any one type of unit. Lende attributed this necessity to the fact that dealers generally preferred to purchase a full line of products from one manufacturer in order to assure the availability of spare parts and service. Based upon this testimony,

it was reasonable for a jury to infer that a manufacturer's customer for Type I units would remain his customer in purchasing units for other vehicles.

The Court finds no merit in defendants' argument that the volume of unit sales during the damage period would be less than that actually achieved if VPC had not been a competitor within the relevant market. Although there is evidence demonstrating that VPC did develop new units and did organize an active sales force, it is also readily apparent from the record that other manufacturers were engaged in development of new units to the same extent of [sic] VPC. Indeed, DPD preceded VPC in some instances. Furthermore, there is no evidence to indicate that the tenacity of the VPC sales force was any greater than that attributable to other manufacturers. Accordingly, the inference that the size of the market would remain the same without the acquisition of Delanair by VWAG is reasonable and supported by sufficient evidence.

### [Damages After Quitting Business]

Lastly, defendants argue that damages cannot be awarded to the plaintiff for that period of time subsequent to Lende's decision to withdraw from competition with VPC. The fact that Lende voluntarily withdrew from the market is irrelevant in determining if plaintiff is entitled to recover damages. "The antitrust law does not require a plaintiff to retain possession of a business oppressed by antitrust violation until the business is bankrupt or directly shut down by the violator." *Pollock & Riley, Inc. v. Pearl Brewing Co.* [1974–2 Trade Cases ¶ 75,191], 498 F.2d 1240, 1244 (5th Cir. 1974); accord *Lehrman v. Gulf Oil Corp.* [1972 Trade Cases ¶ 75,054], 464 F.2d 26, 45 (5th Cir.), cert. denied, 409 U.S. 1077, [93 S.Ct. 687, 34 L.Ed.2d 665] (1972). The question of whether the plaintiff withdrew from the market because it was forced out by the actions of the defendant or whether it withdrew for other reasons was an issue of fact to be determined by the jury in responding to the interrogatory relative to causation. Upon a finding that the defendants' conduct caused the plaintiff's injury, an award for damages subsequent to the plaintiff's withdrawal from the market is not erroneous.

### ELEMENTS OF DAMAGES RECOVERABLE AS A MATTER OF LAW
#### Sales and Profits Allegedly Lost to DPD

Defendants argue that a certain percentage of plaintiff's damage calculations premised upon Method II is unrecoverable because it represents sales lost to DPD rather than VPC. The Court has carefully reviewed the defendants' calculations submitted in support of their argument and finds that they are inconsistent with the damage formula that forms the basis for Method II. Method II was premised upon total industry sales; however, defendants' calculations do not include sales made by VPC. Accordingly, the Court finds the defendants' argument to be devoid of merit.

#### Lost Capital Value

Defendants ask the Court to remit a portion of the damages awarded by the jury that may be attributable to lost capital value. This request is premised upon their argument that lost capital value should be calculated as of April, 1970, the date that Lende decided to concentrate on marketing the Heatransfer unit in the "aftermarket", rather than the date of trial.

Plaintiff is correct in assessing lost capital value as of the date of trial, rather than April, 1970. Lost capital value is to be determined at the date that a business ceases to do business. See, e. g., *Farmington Dowel Products Co. v. Forster Manufacturing Co.* [1970 Trade Cases ¶ 73,075], 421 F.2d 61 (1st Cir. 1969). In the instant case, plaintiff's decision in April, 1970, is no indication that plaintiff ceased doing business altogether. In this regard, the evidence demonstrated that Heatransfer continued to compete in the relevant market long after the April, 1970, date and even attempted to reenter the market in 1973, only to find that the previous anti-competitive conditions continued to exist. Because Heatransfer continued to exist and, to some extent, compete until the time of trial, even though it was terminating its operations at that time, lost capital value was properly assessed as of the trial date.

### [Interest]

Additionally, defendants challenge the inclusion in the claim for damages of $326,000.00 in interest on the capital value computation, arguing that prejudgment interest is not allowable as a matter of law. Plaintiff supports this award by arguing that the damage figure for interest does not represent prejudgment interest but is simply a vehicle for establishing capital value loss at the date of trial. In this regard, plaintiff, through its expert witness, demonstrated what its capital value loss would be as of December 31, 1973. Then, because figures for lost sales and profits were not available for the eight-month period of 1974 prior to trial, plaintiff's expert calculated lost capital value as of the date of trial by adding to the figure for December 31, 1973, an amount equal to a reasonable return on the capital loss value as of December 31, 1973, for the eight-month period of 1974.

In the light of this explanation, the Court does not find that the portion of the damage award labeled "interest" can be considered "prejudgment interest" that is prohibited as a matter of law. Further, although the Court does entertain some reservations with regard to the determination of capital loss value in this manner, it appears that remittitur of the sum labeled interest would result in no change in the judgment in view of the applicable rule in this Circuit that a court may not remit damages below that a jury might have awarded. See,

*Jenkins v. Aquatic Contractors & Engineers,* 446 F.2d 520 (5th Cir. 1971); *Glazer v. Glazer,* 278 F.Supp. 476 (E.D.La.1968). In this regard, the $5,000,000 verdict is less than the jury might have awarded, even if the interest figure were not included in the damage claim. Accordingly, remittitur premised upon the inclusion of interest on the capital value loss in the damage claim will be denied.

### Profits from the Sale of "Other Model" Units

#### [Preparedness and Intentions]

Defendants ask that the Court remit that portion of the damage award attributable to profits from the lost sales of units for "other models" because the plaintiff lacked the necessary "business or property" interest in the sale of units for vehicles other than Type I to permit the plaintiff to recover damages under § 4 of the Clayton Act. This request is based upon the argument that the plaintiff failed to demonstrate sufficiently that it had the preparedness and intention to engage in the manufacture of these additional units, a status that is necessary before an injured party who is about to engage in a business or to expand an existing business must prove before he has standing to claim that he has been injured.

In response, plaintiff admits that it never took affirmative steps in manufacturing these units. However, it argues that proof of preparedness and intention is relevant only to the threshold question of standing and that it has adequately demonstrated its standing through proof that Heatransfer was a going concern engaged in the manufacture of air conditioners for Volkswagen automobiles. In this regard, plaintiff asserts that the question of whether it can recover for lost sales for types of units that it never manufactured is a question relative only to the damage portion of the trial and thus does not subject it to the heavier burden of proof for standing of preparedness and intention to enter a business.

It is undisputed that a plaintiff who has attempted to enter a market but who has not succeeded must demonstrate his preparedness and intention to enter that market before he may recover damages for an antitrust violation that foreclosed the market to him. See e. g., *Martin v. Phillips Petroleum Co.* [1966 Trade Cases ¶ 71,845], 365 F.2d 629 (5th Cir. 1966). Furthermore, even though an antitrust plaintiff operates a going concern, he must demonstrate his preparedness and intent to expand that business into a new market if he claims that expansion of that business into a new market has been foreclosed to him by the monopolistic activities of the defendant. See *Zenith Radio Corp. v. Hazeltine Research* [1969 Trade Cases ¶ 72,800], 395 U.S. 100 [89 S.Ct. 1562, 23 L.Ed.2d 129] (1969); *Volasco Products Co. v. Lloyd A. Fry Co.* [1962 Trade Cases ¶ 70,451], 308 F.2d 383 (6th Cir. 1962). However, the Court does not believe that a going concern, which is the victim of an anti-competitive practice, must forego damages for sales it would have made as the result of the natural expansion of its business simply because it was victimized early in its existence before its attempts to expand could ripen into evidence of preparedness and intent to increase its output. Thus, the question for the Court's determination is whether, under the facts of the present case, the manufacture of units for each type of Volkswagen vehicle in the relevant market can be considered the expansion of a present business into a new market for purposes of standing, or simply one facet of growth in an ongoing business for purposes of damages. The line to be drawn between expansion into new areas and growth in established ones is not easily defined and one that must be determined from the facts of each case.

In the present case, the Court, after much consideration, finds that the sale of "other model" units should be considered as a damage issue. Plaintiff has sufficiently demonstrated that it had a business or property interest in a going concern that had the manufacturing capacity and the market for units for the entire Volkswagen family of automobiles. Testimony at the trial indicated that Volkswagen dealers expected an air conditioner manufacturer to develop a complete line and that these dealers preferred to deal with only one manufacturer who manufactured an entire line to satisfy their needs. It appears that the two major competitors in the market, DPD and VPC, developed additional units during the damage period, even though they manufactured during the base period just about the same variety of units as Heatransfer. Thus, the likelihood for growth and expansion of a business such as that of Heatransfer is evident.

Furthermore, there is evidence to indicate that the various features and components of the units actually manufactured by Heatransfer could be utilized, with some design changes, in additional units that Heatransfer never produced. It does not appear that the manufacturing facilities would have to have been modified to any significant degree in order to accommodate different unit types. Nor does it appear that the plaintiff would have had to obtain new contract rights or additional sources of financing in order to expand.

Thus, the history of the expansion and growth patterns of other competitors in the relevant market, the fact that production facilities did not have to be varied significantly, and the fact that customers for one unit would in all likelihood remain customers for other units lead this Court to the conclusion that the addition of other product lines must be considered as growth of a company for purposes of damages rather than expansion into new areas for purposes of determining standing. In this regard, the proper standard for considering if the jury award for lost sales of these units is supported by the evidence is whether or not such an award is based upon more than mere specu-

## IX. CONCLUSION

The issues presented in this case were complex, involving several sections of the antitrust laws. We have attempted to address ourselves to every issue raised by the litigants without being unnecessarily prolix, bearing in mind the role of an appellate court. We have dealt with some arguments only briefly, and have not discussed some others raised. This was not done through oversight, but was rather the result of our attempt at a careful selection of issues meriting discussion. We are confident that we have fairly responded to the arguments presented by the litigants.[21]

The judgment appealed from is

AFFIRMED.

---

lation and guesswork and not whether plaintiff has carried the more difficult burden in proving standing of showing that plaintiff had the preparedness and intent to expand in these areas.

The Court does not find for the above stated reasons that the assumption that Heatransfer would have expanded is based upon speculation or guesswork. Furthermore, the Court does not find that the application of the Heatransfer markup for its Type I units to the VPC prices for these additional units in determining lost profits and manufacturing costs makes the award speculative. There is evidence to the effect that this markup would have been higher if the plaintiff had based its calculations upon anything other than its Type I markup. Although the profits for these additional units cannot be assessed with complete accuracy, the use of the Type I profit margin in assessing lost profits resulted in a reasonable award under the circumstances of this case. 1975–1 Trade Cas. ¶ 60,309, (S.D.Tex.1975), 66,222–66,225.

**21.** Three issues, which we have not addressed in the body of this opinion, and which both litigants relegated to footnotes, are discussed below:

We find no substance to appellants' argument for a twelve person jury. This was clearly a civil case, with only civil penalties attached. Therefore, as held by the Supreme Court in *Colgrove v. Battin*, 413 U.S. 149, 160, 93 S.Ct. 2448, 2454, 37 L.Ed.2d 522, 531 (1973), "a jury of six satisfies the Seventh Amendment's guarantee of trial by jury in civil cases."

Appellants further argued that the trial court erred in refusing to disallow plaintiff's claim for damages based on Section 7 of the Clayton Act since, appellants claim, a private plaintiff cannot base a damage action on a violation of Section 7. There is much dispute on this issue, see, e. g., *Gottesman v. General Motors Corp.*, 221 F.Supp. 488 (S.D.N.Y.1963), cert. den. 379 U.S. 882, 85 S.Ct. 144, 13 L.Ed.2d 88, but in *Dailey v. Quality School Plan, Inc.*, 380 F.2d 484, 488 (5th Cir. 1967), this Court held: "We see no escape from the logic that § 7 of the Clayton Act is an antitrust statute within the

scope and meaning of § 4 of the Act and so hold." We think this holding is dispositive of appellants' appeal on this issue.

Finally, appellants argue that the trial court erred in refusing to inform the jury that any damages awarded would be trebled, pursuant to Section 4 of the Clayton Act, 15 U.S.Code, Section 15. We need only quote a prior holding of this Court to dispose of this issue: ". . . we hold that the jury should not be advised of the mandatory tripling provision of 15 U.S.C.A. § 15. The primary policy supporting our decision is that underpinning the tripling provision itself. The purpose of treble damage is to deter violations and encourage private enforcement of the anti-trust laws. The justifiable fear of anti-trust plaintiffs is that the juries will adjust the damage award downward or find no liability, therefore thwarting Congress's purpose, because of some notions of a windfall to the plaintiff. One court has even suggested that a jury might take the revelation of the treble damage provision as an intimation from the court to restrict the amount of damages. In sum, we agree with the Court of Appeals for the Tenth Circuit that informing a jury would serve no useful function and its probable consequence would be harmful—an impermissible lowering of the amount of damages.

"Second, it is not for the jury to determine the amount of a *judgment*. Its function is to compute the amount of *damages*. Congress's authorization in 15 U.S.C.A. § 15 to triple the award of damages is a matter of law to be applied by the district court without interference from the jury. The fact that the awarded amount will be tripled has no relevance in determining the amount a plaintiff was injured by the anti-trust violation." (Footnotes omitted).

*Pollock & Riley, Inc. v. Pearl Brewing Company*, 498 F.2d 1240, 1242–1243 (5th Cir. 1974), cert. denied sub nom., 420 U.S. 992, 95 S.Ct. 1427, 43 L.Ed.2d 673. See *Lehrman v. Gulf Oil Corporation*, 500 F.2d 659, 667 (5th Cir. 1974), cert. denied, 420 U.S. 929, 95 S.Ct. 1128, 43 L.Ed.2d 400.