<head>

<title>USCA1 Opinion</title>

<style type="text/css" media="screen, projection, print">

<!--

@import url(/css/dflt_styles.css);

-->

</style>

</head>

<body>

         
                 United States Court of Appeals
                     For the First Circuit

                      ____________________

No. 98-1652

              COASTAL FUELS OF PUERTO RICO, INC.,

                      Plaintiff, Appellee,

                               v.

                CARIBBEAN PETROLEUM CORPORATION,

                     Defendant, Appellant.

                      ____________________

          APPEAL FROM THE UNITED STATES DISTRICT COURT

               FOR THE DISTRICT OF PUERTO RICO
                                
      [Hon. Juan M. Prez-Gimnez, U.S. District Judge]
                      ____________________

                            Before
                                
                    Lynch, Circuit Judge,
                                
Hall, Senior Circuit Judge,

and Lipez, Circuit Judge.

                      ____________________

    William L. Patton, with whom Steven A. Kaufman, Jane E.
Willis, Ropes & Gray, John M. Garcia, and Garcia & Fernandez were
on brief, for appellant.
    Michael S. Yauch, with whom Roberto Boneta, Munoz Boneta
Gonzales Arbona Benitez & Peral, Mark E. Haddad, and Sidley &
Austin were on brief, for appellee.
                      ____________________

                        April 14, 1999
                      ____________________
    LYNCH, Circuit Judge.  In its third visit to this court,
this antitrust price-discrimination case raises a number of
important damages issues.
    After the first trial in this case, this court upheld a
finding of antitrust liability against Caribbean Petroleum
Corporation ("CAPECO") on a Puerto Rican law price-discrimination
theory and a tort verdict of $500,000, but reversed a finding of
monopolization in violation of the Sherman Act.  We vacated the
jury verdict of $1.5 million in single antitrust damages (tripled,
to $4.5 million) and remanded for further proceedings.  We did so
because the antitrust verdict may have included damages for the
monopolization claim, on which we had reversed.  Thus, there was a
reasonable possibility the jury had awarded plaintiff too much.  
Because we were remanding for a new trial on damages, we did not
reach a number of CAPECO's specific challenges to damages evidence
presented by plaintiff Coastal Fuels of Puerto Rico ("Coastal"). SeeCoastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp., 79
F.3d 182, 186, 200-01 (1st Cir.), cert. denied, 519 U.S. 927
(1996).
    This appeal stems from those further proceedings.  
Eventually, the entire price-discrimination damages case was
retried and the second jury returned a verdict on the price-
discrimination claim which was three times larger ($4.5 million
before trebling) than the initial verdict.  Of this $4.5 million,
$2 million was for going-concern damages.  The district court
denied CAPECO's motions for a judgment as a matter of law, for a
new trial, or for remittitur of damages.  See Coastal Fuels of
Puerto Rico, Inc. v. Caribbean Petroleum Corp., Civ. No. 92-1584,
slip op. at 1 (D.P.R. Apr. 23, 1998) ("April 23, 1998 slip op.").
    CAPECO, the party for whose benefit the remand supposedly
operated, appeals from the damages retrial and verdict, raising a
myriad of issues.  Treating Puerto Rican price discrimination law
as largely equivalent to federal price discrimination law, seeCoastal Fuels, 79 F.3d at 190, as the parties have agreed, and thus
analyzing the case under the Robinson-Patman Act, we reverse and
remand.  We also confront and reject a number of CAPECO's other
claims, both to guide further proceedings in this case and to
emphasize our rejection of CAPECO's claim that judgment should
enter in its favor.   
                               I
    We set forth the basic facts which frame the dispute;
fuller details may be found in our earlier opinions.  CAPECO
operated a refinery in San Juan, Puerto Rico.  The refinery's
products included fuel appropriate for marine engines.  Resellers
purchased such fuel, sometimes called bunker fuel, and sold it to
cruise ships and other ocean-going vessels.  CAPECO's refinery was
the only one nearby; CAPECO was the only local source of bunker
fuel.  While a reseller could import fuel from another port,
prohibitive transportation costs made the practice uneconomical.  
CAPECO was, in effect, San Juan's only supplier of bunker fuel.  
CAPECO sold primarily to its two major long-standing customers,
Harbor Fuel Services, Inc. ("Harbor") and Caribbean Fuel Oil
Trading, Inc. ("Caribbean").  While Coastal's parent company,
Coastal Fuels Marketing, Inc. ("CFMI"), had operations elsewhere,
Coastal was a new entrant to the bunker-fuel market in San Juan.  
Coastal began doing business in Puerto Rico in October 1991.  It
looked to CAPECO to supply the needed fuel.  
    In September 1991, CAPECO agreed to sell to Coastal for
six months according to a price formula.  However, CAPECO sold to
two long-standing customers, Harbor and Caribbean, at a discount
from the price charged Coastal, the new entrant.  Harbor and
Caribbean in turn passed on most of this price advantage to their
customers.  In this court's opinion following the first trial we
found that "CAPECO's own expert witness quantified the total price
discrimination in favor of Caribbean and Harbor as $682,451.78 for
the period from October 1991 to April 1992."  Coastal Fuels, 79
F.3d at 187.  Coastal was not profitable during this period.
    At the time of Coastal's entry into the San Juan market,
Harbor had 54% of the market, Caribbean had 40%, and Esso had 6%.  
Coastal's 1991 business plan projected it would gain a significant
foothold in the San Juan market within the first year of operation.  
Coastal estimated that it would be able to sell 100,000 barrels of
fuel per month, or more than a million barrels a year.  The total
size of the San Juan market, Coastal estimated, was between 2.5 and
4.0 million barrels per year.  During the first five months of
Coastal's operation, the actual average price advantage given by
CAPECO to Coastal's competitors was $.48 per barrel in favor of
Harbor and $.37 per barrel in favor of Caribbean.  During Coastal's
remaining thirteen months of operation, the price differential
varied, averaging about a $.07 per barrel disadvantage to Coastal.  
The cost of marine fuel oil sold by CAPECO during this eighteen
month period varied from $8 to $13 per barrel.
    In May 1992 Coastal filed this action and sought to
enjoin CAPECO from future price discrimination.  The district court
denied the injunction, and this court affirmed.  See Coastal Fuels
of Puerto Rico, Inc. v. Caribbean Petroleum Corp., 990 F.2d 25 (1st
Cir. 1993).  After Coastal filed suit, CAPECO made a take-it-or-
leave-it price offer to Coastal, which Coastal took.  Coastal still
paid more for CAPECO's product than did Coastal's competitors.  
CAPECO cut off supply to Coastal completely on March 31, 1993, and
Coastal went out of business shortly thereafter.  Coastal never
became a profitable business; it lost almost $2 million during its
eighteen months in operation.
    In July 1992, Puerto Rico imposed an excise tax of $.84
per barrel on the resale of bunker fuel in Puerto Rico.  The tax
hurt the total sales of bunker fuel in San Juan Harbor.  The
ultimate market voted with its fleet, as cruise boats chose to fill
up at other ports not subject to the tax.  The tax was repealed in
December 1993, eight months after Coastal had gone out of business.  
The excise tax reduced sales volumes in Puerto Rico by roughly 37%,
from about 3.8 million barrels in 1992 to about 2.4 million barrels
in 1993.  After the repeal of the excise tax in December 1993, the
San Juan sales volume started to climb back up, reaching 3.1
million barrels in 1994.  After Coastal went out of business, one
of Coastal's competitors, Caribbean, also left the market, in the
fall of 1993.  The other major reseller, Harbor, thus enjoyed a
greater share of the market, although it faced new competition over
time.
    CAPECO itself closed down its refinery in April 1995.  In
1996, total San Juan Harbor sales volume was less than 2 million
barrels.  When CAPECO closed its refinery, Coastal had already been
out of business for more than two years.  At the time CAPECO
closed, it stated that its closing was temporary.  But it has
apparently not reopened its refinery.  As a result, bunker fuel
resellers in San Juan Harbor must import fuel from elsewhere.
                               II
    Our 1996 decision upheld a finding of liability on a
price-discrimination claim based on Puerto Rican law against
defendant CAPECO, reversed the claim under the federal Clayton Act,
as amended by the Robinson-Patman Act, because no discriminatory
transaction crossed a state line, and reversed a Sherman Act
monopolization claim.  The jury had awarded $1.5 million in single
antitrust damages (combining both the monopolization and price-
discrimination theories) and $500,000 for the tort claim.  The $1.5
million was trebled and the $500,000 added.  The tort verdict is no
longer in dispute.  This court vacated the antitrust damages
verdict, saying the $1.5 million was most likely excessive because
it may well have included damages stemming from harms associated
with monopolization but not with price discrimination.  
    We found that CAPECO had waived any argument that this
was a "primary line" price-discrimination case and we analyzed it
as a case of "secondary line" discrimination:  "Thus, the theory of
injury is that CAPECO sold bunker fuel to Coastal at an unfavorable
price relative to Harbor and Caribbean, and consequently,
competition between Coastal, Harbor and Caribbean was thereby
injured."  Coastal Fuels, 79 F.3d at 189.  In secondary line cases,
plaintiffs usually allege that discriminatory pricing (here, by
CAPECO) gave favored purchasers (here, Harbor and Caribbean) an
advantage that caused injury through loss of business.  Typically,
Robinson-Patman plaintiffs show lost sales or lost profits or both.
    Once substantial price discrimination was shown, under
the Morton Salt rule, see FTC v. Morton Salt Co., 334 U.S. 37
(1948), we held there was a prima facie case of injury to
competition, see Coastal Fuels, 79 F.3d at 191-93.  Recognizing
that the Robinson-Patman Act, unlike the Sherman Act, was meant
less to protect consumer welfare than to protect small merchants,
this court rejected CAPECO's arguments that changes in the law on
primary line price discrimination, more akin to the Sherman Act,
meant that the Morton Salt rule could no longer be applied to
secondary-line Robinson-Patman cases.  See id. at 191-93.
    Because the jury necessarily concluded that CAPECO's
evidence was insufficient to overcome the prima facie case plus
other evidence offered by Coastal, this court examined whether
CAPECO's evidence was so strong as to compel the conclusion that
there was no causal connection between the price differential and
Coastal's lost sales and profits.  We held that CAPECO's evidence
was not sufficient to conclude there was no causal relationship to
Coastal's lost sales or profits.  Thus, we found no basis to
reverse the jury's implicit finding of actual injury to
competition.  We stated:
    [R]egardless of whether these costs were factored
    directly into the prices that Coastal offered, or were
    later calculated into Coastal's bottom line, these costs
    affected Coastal's pricing.  Certainly, no argument can
    be made from this evidence alone that bunker fuel costs,
    no matter when accounted for, were not causally connected
    to Coastal's lost profits.

Id. at 194.
    Our discussion of the damages awarded at the first trial
focused on only two issues, although others were raised.  The first
was whether Coastal, as a new market entrant, was required to use
the "yardstick" method as opposed to the "before and after method"
of calculating damages.  The second was the possibility of an
excessive recovery.  Because we were vacating and remanding for
further proceedings on the second issue, we did not decide the
first issue (the methodology for calculating damages) or any other
issues.  We did not reach CAPECO's challenges to Coastal's expert
testimony, in particular CAPECO's claim that Coastal's expert
should not have been permitted to calculate going-concern damages
as of 1996, rather than as of the date in 1993 that Coastal went
out of business.  See id. at 200-01.
                              III
A.   The Further Proceedings
    The parties disagreed about what should happen on remand.  
CAPECO argued for a new trial in order to reopen issues of injury
in fact and causation as well as to determine the appropriate
amount of damages.  In contrast, Coastal asked the court to enter
a verdict of $1.5 million (before trebling) under Federal Rule of
Civil Procedure 49(a) on the ground that there had been no
inclusion of monopolization damages in the verdict and therefore no
duplication in that sum.
    The district court rejected both CAPECO's and Coastal's
arguments.  With regard to CAPECO's arguments, the court stated
that CAPECO could not reopen the issue of price-discrimination
liability, because remand was for determination of damages only.  
See Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum
Corp., Civ. No. 92-1584, slip op. at 3-4 (D.P.R. Mar. 5, 1997).  
With regard to Coastal's request, the court stated that
"[c]onsideration of the flawed [monopolization] claim may have
affected the verdict, and it is impossible to tell whether or to
what extent it did."  Id. at 9.  The court thus ordered "a new
trial by jury to determine damages due solely to price
discrimination."  Id. at 10.  The court concluded that any
objection to the "before and after" methodology had been waived by
CAPECO.  It also concluded that "the methodology used is adequate,
particularly in light of the relatively relaxed standard for
establishing the amount of damages."  Id. at 11.
B.   Evidence at the Second Trial
    Executives at Coastal and its affiliated companies
testified they had prepared a business plan which projected that
Coastal would initially sell about 100,000 barrels a month.  The
prospective customers were expected largely to come from customers
who bought from Coastal's sister companies' operations at other
ports.  Coastal's plan called for a gross margin of $1.65 per
barrel (compared with Harbor and Caribbean's respective margins of
$1.79 and $1.83 per barrel).  Coastal's market share rose over its
first several months of operation, reaching 27% in December 1991.  
Its share thereafter dropped to 15% over 1992; Coastal claims that
this drop resulted from its competitors passing on CAPECO's
discriminatory discounts to their customers.
    Coastal's principal damages witness, Robert Sherwin, did
not use either a "yardstick" or a "before-and-after" methodology
but rather what Coastal calls a "but-for" methodology.  Sherwin's
choice of methodology was supported by the testimony of another
Coastal expert, Professor Bradford Cornell of UCLA.  Sherwin
calculated total damages near $8 million, roughly consisting of two
components.  He calculated lost profits from 1991 to 1996 at $3.475
million.  This component in turn included actual lost profits from
1991 to 1993 and projected lost profits from 1993 through 1996.  As
in the first trial, he also calculated Coastal's going-concern
value.  In the first trial, Sherwin valued Coastal's going concern
value at $4.379 million as of the end of 1996.  At the second
trial, he valued Coastal's going concern value at $4.49 million as
of the end of 1996.  At the second trial, the choice of 1996 was
justified as the first date near which there was market stability.  
Although at the first trial Sherwin testified that Coastal's actual
damages were approximately $7 million, in the second trial he
apparently modified his analysis to take account of actual events
in 1994 and 1995, after the first trial.  It should also be noted
that the $7 million at the first trial also included monopolization
damages, but the $8 million damages estimate at the second trial
did not.  Sherwin did testify that the imposition of the tax on
bunker fuel in mid-1992 meant, apart from any price discrimination,
that Coastal would not have made its projected $200,000 profit for
that year.  Further, he testified that in 1993, due partially to
the excise tax, Coastal would have lost over $300,000.
    CAPECO's primary damages expert was Professor Jerry
Hausman of MIT.  For purposes of his analysis, he calculated what
Coastal's market share would have been, absent price
discrimination, and compared his results with what actually
happened.  Hausman testified that Coastal's market share, around
16%, would not have changed if there had been no price
discrimination, that Coastal lost no sales as a result of price
discrimination, and that at most it lost margin on sales actually
made.  He calculated these lost-margin damages at $106,000.  
However, his testimony on market share and his damages calculation
were stricken by the district court and the jury was told to
disregard his testimony.  Coastal characterizes this exclusion as
justifiably based on Daubert and Rule 26 grounds; CAPECO believes
that the court erred under Daubert and Rule 26.   
    Dr. Hausman also testified that Coastal would have gone
out of business in April 1993 even absent price discrimination and
so there was no basis for post-April 1993 damages.  This later
testimony was apparently also stricken.  After cross-examination,
the court instructed the jury to disregard Hausman's testimony,
stating:  
    I have excluded . . . all of Dr. Hausman's testimony
    concerning his damages report . . . .  That is no longer
    evidence. . . . It is not a fact in the case, and it
    should not enter into your considerations when you go to
    deliberate.  
 
CAPECO's other expert, Dr. Freyre, made no independent calculation
of damages, but testified that the excise tax had a bigger effect
on Coastal than the price discrimination and that Sherwin's market-
share analysis was based on unreasonable assumptions.
                               IV
A.   Damages Instructions
    The parties clash over whether the district court erred
in its instructions to the jury regarding damages and whether it
was permissible for the jury to award lost profits up to the time
of trial in 1998 and going-concern value as of that date.  We find
error.   
    The relevant portion of the court's instructions stated:
    Plaintiff claims it is entitled to recover any profits it
    lost as a result of the price discrimination caused by
    the defendant.  Profit in this sense is net profit, and
    simply means the amount by which plaintiff's gross
    revenues would have exceeded all of the costs and the
    expenses that would have been necessary to produce those
    revenues.
         Plaintiff also claims it is entitled to damages
    for future lost profits as a result of the price
    discrimination caused by the defendant.  If you find that
    defendant's price discrimination has caused plaintiff to
    lose profits it could otherwise reasonably expect to earn
    in the future, you may award plaintiff damages for those
    future lost profits.
         And in computing future profits, the law provides
    that the plaintiff may recover his lost profits from the
    date it cease[d] doing business [in 1993] until a date at
    or near trial, and in addition, its going-concern value
    as of that day.      

No instructions were given as to the meaning of going-concern
value.  CAPECO preserved its objections relevant to this appeal,
and neither party claims that this issue was resolved by our prior
opinion in this case.   
    The trial court essentially set three damages periods: a)
damages until Coastal went out of business in 1993; b) damages from
1993 until the time of the 1998 trial; and c) Coastal's going-
concern value as of the 1998 trial.  For purposes of the verdict
form, damages from periods a) and b) together were given as a
single sum -- only going-concern damages were specifically
separated out on the verdict form.  These three periods differed
somewhat from the periods used by Sherwin, Coastal's damages
expert.  Sherwin broke the damages down into actual damages prior
to March 31, 1993, lost profits from that date until December 31,
1996, and going-concern damages as of the end of 1996.  We do not
know whether the jury estimated going-concern value as of December
31, 1996, as Sherwin testified, or as of a date closer to trial in
1998, as the court instructed.  In any event, whether the
calculation was done as of the end of 1996 or as of early 1998
makes no difference to our finding that going-concern damages
should have been calculated as of early April 1993.  As explained
below, we think the calculation of going concern value should
normally be as of the date the company goes out of business.  Of
the various damages models available, that model is most likely to
be accurate.   
    CAPECO first attacks the latter two categories of the
district court's instructions -- lost profits and going-concern
value -- and of Sherwin's calculations.  CAPECO argues that the
court erred in instructing the jury that it should assess Coastal's
going-concern value (and consequently future lost profits) as of a
time near trial in 1998, not the time Coastal left the San Juan
market in April 1993.  We find that the court erred in its
instructions and that lost profits were limited to the period
Coastal was actually in business and going-concern value should
have been calculated as of the date Coastal went out of business.  
    The court did not instruct the jury that the jury could
find going-concern value as of some time between 1993 and the 1998
trial date, or as of the time Coastal went out of business in 1993.  
Nor did it so instruct as to the calculation of lost future
profits.  Because of this lack of alternatives, the court's
instructions could effectively be understood to tell the jury that
if it awarded damages for future lost profits or for going-concern
value, it had to do so calculating those damages respectively to a
date at or near trial and as of a date at or near trial.  This was
error, because the court could not direct the jury to assume the
hypothesis was true that Coastal would have remained in business
until 1998.  But the instruction was also wrong for other, more
fundamental reasons.
    The parties' arguments help frame the problem.  CAPECO
contends that, as a matter of law under our decision in Farmington
Dowel Products Co. v. Forster Manufacturing Co., 421 F.2d 61 (1st
Cir. 1970), and as a matter of the facts of this case, there was no
basis to go beyond 1993 as to either going-concern value or lost
profits.  It says Sherwin's estimate of going-concern value was
excessively speculative because the estimate was based on
assumptions that CAPECO would not have terminated its relationship
with Coastal, regardless of price discrimination, that Coastal
would have nonetheless remained in business beyond 1993, and that
Coastal would have remained and enjoyed a permanent advantage in
the San Juan market once CAPECO closed its refinery in 1995.  
According to CAPECO, the difference in the choice of date at which
to make a calculation of going-concern value is significant because
in 1993 Coastal was unprofitable, had no likelihood of becoming
profitable, and thus had no going-concern value, due both to the
tax and to Coastal's lack of a local supplier of bunker oil.
    Coastal, in turn, contends that assessing market
conditions as of 1993 would have been inappropriate because market
conditions were "abnormal" due to the combination of the excise tax
and the price discrimination.  Market conditions, it says, were
much more stable by the end of 1996, thus permitting a more
accurate evaluation of Coastal's going-concern value.
    The principle that an antitrust plaintiff may recover
both actual lost profits and diminution in the value of its
business is well established.  See Story Parchment Co. v. Paterson
Parchment Paper Co., 282 U.S. 555, 561-67 (1931).  Where plaintiff
has been forced out of business, however, it is awarded its going-
concern value or its projected future lost profits, but not both.  
Usually courts follow the Farmington Dowel model and award going-
concern value for a company which is no longer in business.  See  
Farmington Dowel, 421 F.2d at 81; 2 P. Areeda & H. Hovenkamp,
Antitrust Law  365b4, at 243 (rev. ed. 1995) (stating that damages
for a plaintiff who is forced out of business "would ordinarily be
measured by its capital value: the price at which he could
reasonably have sold the business as a going concern").  The choice
of date on which going-concern damages should be evaluated has
appropriately focused on whether a particular means of evaluating
a firm's going-concern value would be excessively speculative.   
    In Farmington Dowel, this court required that plaintiff's
damages be calculated as of the date plaintiff went out of
business, as opposed to a date close to trial, some ten years
later.  See Farmington Dowel, 421 F.2d at 81.  Farmington rejected
the method urged by plaintiff because it  
    would have required an estimate of profits for a period
    of some ten years during which the company neither
    existed nor made profits, plus an estimate of the going
    concern value . . . of a company which had ceased being
    a going concern over ten years before, which estimate
    would have involved a further estimate of profits for a
    more remote future period.   

Id.  Substitute "four years" for the "ten years" in Farmington
Dowel and we have the same situation here.   
    In Farmington Dowel, we noted that evaluating going-
concern value at a date "long after the company ceased to be a going
concern" relied "too heavily on speculation and conjecture."  Id.  
A number of other circuits similarly have estimated going-concern
values as of the date the plaintiff ceased doing business.  See,e.g., Heatransfer Corp. v. Volkswagenwerk, A.G., 553 F.2d 964, 986
n.20 (5th Cir. 1977) ("Lost capital value is to be determined at the
date that a business ceases to do business."); Albrecht v. Herald
Co., 452 F.2d 124, 130-31 (8th Cir. 1971), abrogated on other
grounds by State Oil Co. v. Kahn, 522 U.S. 3 (1997).  But seeSouthern Pines Chrysler-Plymouth, Inc. v. Chrysler Corp., 826 F.2d
1360, 1363-64 (4th Cir. 1987).  In addition, we have remanded or
reversed antitrust cases where we have found that significant error
by the trial court may have contributed to the jury award.  See,
e.g., Sullivan v. National Football League, 34 F.3d 1091, 1106-1113
(1st Cir. 1994) (invalidating a $51 million jury verdict for
antitrust damages due to trial court error in jury instructions).
    Coastal contends that its facts are different from those
in Farmington Dowel, and in particular that the length of time
between the date Coastal was forced out of business and the date of
the second damages trial (more than four years later) was not so
long as to render a date near trial excessively speculative.  
Coastal also contends that going-concern value is best estimated
given reasonably normal business conditions, a general proposition
with which Dr. Freyre, one of CAPECO's experts, agreed.  Coastal
then argues that such conditions only existed after the tax was
repealed.  
    We conclude that the Farmington Dowel framework -- that
going-concern value should be evaluated as of the time plaintiff
goes out of business and actual lost profits awarded only up to that
date -- is and should be the norm.  It may be that in some
situations the difference between the date the company went out of
business and the date of trial is not great and the issue does not
arise in any significant sense.  But here, more than four years had
passed.  We do not adopt a per se rule that four years is inherently
too great a gap, but we think it raises such risks of speculative
evidence that the Farmington Dowel framework presumptively applies.
    There are significant differences between the methodology
followed by Coastal's expert and the trial court instructions on the
one hand, and the Farmington Dowel framework on the other.  The
trial court's instructions effectively assumed that Coastal would
have existed four years longer than it did, and thus deserved any
lost profits for that period.  In addition, the jury was asked to
give additional damages for going-concern value as of 1998.  The
Farmington Dowel framework, in contrast, asks what a reasonable
buyer would have paid for Coastal in 1993 (rather than in 1998,
where any going-concern value assumes Coastal survives until 1998).  
That is a very different question.
    The burden is on the plaintiff to show circumstances which
warrant choice of some date other than the date the company went out
of business and that the evidence proffered is not speculative.  
Coastal has not made that showing and is thus bound by the
Farmington Dowel framework.
    Coastal contends that it is excused from using the date
the company went out of business because going-concern damages
should be considered only at a time of market stability.  There are
several responses.  First, whether that proposition is true depends
upon context.  Inherent instability in a market (for reasons other
than defendant's violation of law) hardly warrants building in an
assumption that the company would have survived such instability.  
Second, given the facts of this case, this is a hollow argument.  
Although the Puerto Rico excise tax may have made the market
unstable, this market appears to have been inherently unstable:
numerous competitors entered and exited the San Juan market during
the period this dispute covers and the price of bunker fuel
fluctuated widely.  There is little reason to suggest that the
market was more stable as of the date of trial -- when CAPECO had
actually shut its refinery several years earlier.  It may be that
in certain cases temporary market instability will provide a ground
for departing from the rule we articulate here, but this is not such
a case.   
    The third response is that market stability four or ten
years later does not mean that the exercise of estimating lost
profits or going-concern damages over that intervening period is not
speculative.  That Coastal's choice of date on which to calculate
its going-concern damages was arbitrary, and thus speculative, is
highlighted by the fact that the district court and Sherwin actually
selected different dates on which the going-concern valuation should
be made -- Sherwin argued that the calculation should be done as of
the end of 1996, while the court instructed the jury to perform the
calculation as of a date near the February 1998 trial.  This in turn
raises the prospect that there may have been an additional error in
an impermissible overlap of fourteen months in the awards of lost
profits and going-concern value if the jury used Coastal's expert's
date and calculations to determine going-concern value and the
district court's date to calculate lost profits.
    The use of a date more than four years after the actual
events, on the facts of this case, strikes us as a speculative
enterprise, and Coastal's justification does not suffice.  In
Sullivan v. Tagliabue, 25 F.3d 43 (1st Cir. 1994), we commented that
damages were likely speculative where "the asserted harm . . . is
indirect, and likely the result, at least in part, of independent
intervening factors" and where damages are difficult to calculate.  
Id. at 52.  In Associated General Contractors of California, Inc.v. California State Council of Carpenters, 459 U.S. 519 (1983), the
Supreme Court commented that an antitrust damage claim was highly
speculative where harm was "indirect" and "may have been produced
by independent factors."  Id. at 542.
    Further, our sense that Coastal's methodology is very
speculative is confirmed by what actually happened.  Here, because
of the lapse of time, we have some information about later market
conditions.  That information confirms our earlier judgment that
this case requires adherence to the Farmington Dowel format.  CAPECO
argues that awarding damages to Coastal as if it had remained in
business involves assuming too many links in the causal chain: that
Coastal would have stayed in business despite the tax, that Coastal
would then have been well-positioned to reap the benefits of the
repeal of the tax, and that Coastal would have survived the closing
of the CAPECO refinery and would have been even better placed to
take advantage of CAPECO's closing of its refinery.  
    These links are sufficiently questionable as to reinforce
the use of the Farmington Dowel methodology.  Coastal's San Juan
business was not profitable during the short time it was in
business.  It lost over $2 million in eighteen months.  Indeed
Coastal's own expert said that Coastal would have lost $300,000 in
1993.  But while Coastal presented evidence regarding the profits
it might have earned had it still been competing in San Juan after
1996, it presented little evidence regarding its ability to become
profitable and remain in San Juan up until that date.  For example,
Coastal presented little evidence showing why it was more akin to
Harbor, a competitor with a San Juan market share ranging from 71%
to 100% between 1994 and 1996, than to other suppliers that failed
to survive.  In addition to the assumption that Coastal would have
survived in what was by all accounts a very competitive market,
there is also the assumption that Coastal would have reaped a
windfall from CAPECO's 1995 cessation of refining operations.  
    At first blush it might seem odd that Coastal would claim
to receive a benefit from CAPECO's departure from the market in
1995.  CAPECO  was, after all, the sole supplier of both Coastal and
Coastal's competitors, and loss of a supplier who is a sole source
is not usually good news for a company.  But Coastal says it was
uniquely blessed -- it could have brought in supplies from other
Coastal operations elsewhere and thus would have gained market
share.  The argument proves too much.  Coastal did not reenter the
market when CAPECO closed its refinery in 1995 or any time
thereafter, despite the potential profits to be made.  It is simply
too speculative to build in an assumption that Coastal certainly
would have been able to rely on imports from elsewhere in a
hypothetical world.  Thus, this case is governed by the Farmington
Dowel rule that going-concern value is determined as of the date
Coastal went out of business.
    Farmington Dowel also governs a related aspect of damages.  
Farmington Dowel held that the district court correctly confined
plaintiff to the lost profits up until the date the plaintiff went
out of business plus the going-concern value on that date.  SeeFarmington Dowel, 421 F.2d at 80-82.  It follows that lost profits
beyond 1993 -- the profits Coastal claims that it would have
received from the date it went out of business until the second
trial in 1998 -- cannot be awarded separately.  Projected future
profits may be factored into the going-concern value of the firm at
the time it went out of business.  Coastal may recover actual
damages until it went out of business.  It may also recover its
going-concern value as of that date.  But it may not recover both
going-concern value and lost profits after that date.  As this court
said in Farmington:
    To do so would result in a clear duplication: [the
    plaintiff] would get its present value as a going concern
    plus its future profits, but the latter figure would be
    a major element in determining the former figure.

Id. at 82; see also 2 Areeda & Hovenkamp  365b4, at 244 ("Of
course, both future profits and going-concern value may not be
granted in a given case, for that would be double counting.  
Furthermore, any such damages must be reduced by revenues made
possible by the termination." (footnote omitted)).   
    We know that the second verdict assigned $2 million to the
going-concern value, a value instructed to be calculated as of 1998.  
This means that the jury assigned $2.5 million to the remaining
damages -- that is, damages from Coastal's inception until Coastal
went out of business in 1993 plus damages from 1993 until 1998.  
Because we are unable to assign a portion of the damages to the
losses Coastal suffered prior to March 1993, we cannot save any
portion of the verdict.  Thus, if the parties are unable to resolve
the matter, it must go back for yet another damages trial.
    At that trial Coastal is confined to its actual lost
profits as of the date it went out of business in 1993, plus its
going-concern value calculated as of that date but for CAPECO's
price discrimination.  This means what a willing buyer would have
paid for Coastal in early April 1993.  We emphasize that the going-
concern value is not necessarily zero.  The mere fact that Coastal
had never earned profit to that point does not mean it had no value
as a going concern.  See Heatransfer Corp., 553 F.2d at 986 n.20
("[T]he Court does not believe that a going concern, which is the
victim of an anti-competitive practice, must forego damages for
sales it would have made as the result of the natural expansion of
its business simply because it was victimized early in its existence
before its attempts to expand could ripen into evidence of
preparedness and intent to increase its output."); Terrell v.
Household Goods Carriers' Bureau, 494 F.2d 16, 23 n.12 (5th Cir.
1974) (rejecting an argument that a business that was not profitable
as of the time it went out of business should be valued at zero, and
commenting that "[t]o deny recovery to a businessman who has
struggled to establish a business in the face of wrongful conduct
by a competitor simply because he never managed to escape from the
quicksand of red ink to the dry land of profitable enterprise would
make a mockery of the private antitrust remedy").
B.   CAPECO's Argument Against Any Going-Concern Value
    CAPECO makes two other arguments which it says mean that
the jury could not even consider whether to award going-concern
damages at all: CAPECO contends that its refusal to deal with
Coastal after March 1993 was completely legal and therefore no
antitrust damages could lie after the termination, and that awarding
damages after that date would constitute a duplicative recovery.  
These arguments are different from its argument that Farmington
Dowel must apply.  The logic of these arguments would require entry
of a verdict in CAPECO's favor on all claims except claims for the
actual damages Coastal suffered prior to CAPECO's cessation of
business on March 31, 1993.  We reject both arguments.  We also
reject CAPECO's argument that the jury was required to conclude that
Coastal suffered no damages before March 31, 1993 as a result of the
price discrimination.
    First, CAPECO argues that this court "held that CAPECO's
refusal to deal with Coastal after March 31, 1993 did not violate
the antitrust laws."  From this CAPECO argues that it cannot be
responsible for any damages stemming from Coastal's going out of
business or damages after that date.  Whether or not the syllogism
is sound, the premise is not.  This court did not hold that CAPECO's
refusal to deal was not illegal.
    Further, the evidence fully supported the district court's
finding that "there was sufficient evidence upon which the jury
could conclude that Coastal closed down its operations because of
the price discrimination."  April 23, 1998 slip op. at 4.  Coastal
presented testimony from Daniel Hill, the former chairman of Coastal
Fuels of Puerto Rico, that Coastal departed from the San Juan market
because of the price discrimination and refusal to deal.  As the
district court noted, "CAPECO had a full opportunity to cross-
examine Mr. Hill based on his 1994 testimony and did so.  Any
questions as to credibility were for the jury."  Id.  CAPECO's
refusal to deal was a direct result of Coastal's filing of this
lawsuit and thus of CAPECO's price discrimination.  We need not
determine whether CAPECO's price discrimination directly forced
Coastal out of business or whether price discrimination led to the
refusal to deal and thus Coastal's demise; in any event, sufficient
evidence was presented to the jury for it to find that Coastal's
going out of business was causally linked to CAPECO's illegal
behavior.
    In contrast to the evidence presented by Coastal that the
refusal to deal was a direct result of CAPECO's price
discrimination, CAPECO has cited no portion of the record that
supports its contention that it would have cut Coastal off absent
the price discrimination and ensuing lawsuit, apparently because
CAPECO did not introduce any such evidence.  See id. at 5 ("CAPECO
cites no authority to sustain its assertion that a defendant who is
engaging in price discrimination must be allowed to stop the accrual
of a plaintiff's damages by refusing to deal. . . . CAPECO presented
no testimony as to the refusal to deal and, in fact, never argued
to the jury that Coastal was not entitled to any future profits
because of the refusal to deal.").  Given this failure, we agree
with the district court's determination "that the jury had
sufficient evidence upon which it could have concluded that
Coastal's . . . decision to close operations [was] due to price
discrimination."  Id.  We consider this issue -- of whether damages
from Coastal's going out of business were causally related to the
price discrimination -- to have been resolved against CAPECO by at
least the second (and perhaps the first) jury, and CAPECO is not
free to argue otherwise on remand.  
C.   Duplication of Tort Recovery
    CAPECO's argument that the price-discrimination recovery
duplicated the tort recovery in the first trial fails.  CAPECO
contends that the tort award from the first trial was, in effect,
an award of lost profits for the period after 1993, and thus that
any post-1993 damages for price discrimination would constitute a
duplicative recovery.  The district court rejected this contention,
noting that "Coastal's expert testified only as to damages resulting
from price discrimination and CAPECO presented no evidence that any
part of Coastal's damages were occasioned by CAPECO's tortious
conduct."  Id. at 15.  In its brief to this court, CAPECO does not
point to evidence in the record that suggests otherwise.   
    More importantly, this court earlier found that CAPECO had
waived its duplicative recovery argument.  We explicitly rejected
CAPECO's claim that a new trial on liability or a remittitur was
required because an award of damages for price discrimination would
be duplicative of the tort award.  See Coastal Fuels, 79 F.3d at
201-02.  That issue was foreclosed, should not have been raised
here, and may not be raised again.
D.   Other Instructions
    There was another type of error in the jury instructions.  
That error has to do with the burden of proof.  The judge instructed
the jury that "Coastal is not required to prove the amount of its
damages with any certainty."  As stated, the instruction was
acceptable.  The court expressly instructed the jury that because
the first trial had determined that CAPECO's price discrimination
had caused injury to Coastal, the jury's only function was to
determine the amount of the damages.  Although the district court
was correct as to the scope of the remand -- to determine the amount
of damages -- in doing so the court went on to expressly instruct
the jury to disregard the preponderance-of-the-evidence standard and
to apply a lesser standard:  "At the beginning of the case I
mentioned to you preponderance of the evidence.  You must put that
out of your mind, because in a price discrimination case such as
this one, a lesser standard is applied."  That was error.
    The district court thought its instruction was required
by statements in our prior opinion.  See April 23, 1998 slip op. at
3, 8 (citing Coastal Fuels, 79 F.3d at 200).  The confusion in this
area starts with the language of the 1931 Supreme Court decision in
Story Parchment.  Story Parchment was a Sherman Act conspiracy-to-
monopolize case in which the three defendant companies conspired to
destroy the plaintiff company, a new entrant in the field, by so
cutting their previously stable prices that the prices fell first
below the point of fair profit and later below the costs of
production.  The jury awarded damages based on evidence comparing
the old prices, which were reasonable and which the jury found would
have been maintained but for the unlawful acts, with the prices
actually received.  The circuit court reversed the verdict,
concluding there was no basis for a reasonable inference that prices
in excess of those actually realized would have prevailed if there
had been no unlawful combination, and that in any event the damages
were based on speculation and conjecture.  The Supreme Court
disagreed and said, famously:
    Where the tort itself is of such a nature as to   preclude
    the ascertainment of the amount of damages with   certainty, it would be a perversion of fundamental     principles of justice to deny all relief to the injured
    person, and thereby relieve the wrongdoer from making any
    amend for his acts.  In such case, while the damages may
    not be determined by mere speculation or guess, it will
    be enough if the evidence show the extent of the damages
    as a matter of just and reasonable inference, although
    the result be only approximate.

Story Parchment, 282 U.S. at 563.  It was from this language that
the district court picked up its "just and reasonable inference"
language, and it is presumably on this same language that the court
based its instruction that plaintiff bore a burden of proof of less
than a preponderance of the evidence.  We read Story Parchment to
hold that the amount of damages is an issue on which reasonable
estimates based on inferences are permissible.  But this does not
mean that the jury is free to act on less than a preponderance of
the evidence.  See generally Story Parchment, 282 U.S. 555; see alsoJ. Truett Payne Co. v. Chrysler Motors Corp., 451 U.S. 557, 568
(1981); Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S.
359, 378-79 (1927).  In Story Parchment, the Court distinguished
between two different situations involving uncertain damages: one,
where uncertain damages are not recoverable because they are not the
certain result of the harm; the other, where damages are recoverable
because the fact of damage is "definitely attributable to the wrong
and only uncertain in respect of [the] amount."  Story Parchment,
282 U.S. at 562.
    The district court used the well-worn phrase from Story
Parchment outside of its normal context -- a trial encompassing both
liability and damages -- where the phrase is usually thought to mean
only that an antitrust plaintiff need not "establish the amount of
damages with mathematical precision."  ABA Section of Antitrust Law,
Antitrust Law Developments 785 (4th ed. 1997).  Its use was
inappropriate here.
    The greater flexibility described in Story Parchment  
recognizes the difficult task of "quantifying the difference between
what actually happened and what would have happened in a
hypothetical free market."  Fishman v. Estate of Wirtz, 807 F.2d
520, 550 (7th Cir. 1986).  It is one thing to say there needs to be
some flexibility in proving the amount of damages relating to  
hypothetical events.  Such flexibility is needed both in practical
terms given the nature of the proof, and to avoid rewarding a
wrongdoer for its misconduct.  It is quite another thing to suggest
that an antitrust plaintiff does not need to show probability that
the damages caused by the wrongdoer's misconduct fall within a
reasonably estimated range of damages.
                                V
A.   Expert Testimony
    Some issues which may come up at retrial deserve brief
attention.  First, CAPECO complains about the exclusion of most of
the testimony of Dr. Hausman, its expert.  We review a district
court's decision to admit or exclude expert testimony for abuse of
discretion.  See Kumho Tire Co. v. Carmichael, No. 97-1709, slip op.
at 2 (U.S. Mar. 23, 1999); General Elec. Co. v. Joiner, 118 S. Ct.
512, 517 (1997); Licciardi v. TIG Ins. Group, 140 F.3d 357, 362-63
(1st Cir. 1998); Newell Puerto Rico, Ltd. v. Rubbermaid Inc., 20
F.3d 15, 20 (1st Cir. 1994).  
    CAPECO argues that the court excluded Dr. Hausman's
testimony because it erroneously found his economic oligopoly theory
unacceptable.  If that was what had happened, we would have
considerable sympathy for CAPECO's argument.  Cf. Daubert v. Merrell
Dow Pharmaceuticals, Inc., 509 U.S. 579, 594-95 (1993); Ruiz-Trochev. Pepsi Cola of Puerto Rico Bottling Co., 161 F.3d 77, 85 (1st Cir.
1998) (stating that Daubert requires "that the proponent of the
evidence show that the expert's conclusion has been arrived at in
a scientifically sound and methodologically reliable fashion").   
    But our reading of the record is that the more likely
basis for the exclusion was the district court's belief that there
was considerable and unjustified variance between the expert's Rule
26 report and his testimony, and that the district court found that
Hausman had unintentionally misled the court into believing that he
had performed certain crucial calculations when he had not in fact
done them.  Such a ruling would hardly be an abuse of discretion.
See Licciardi, 140 F.3d at 364 (stating that expert testimony should
have been excluded where such testimony went "far beyond the scope
of [the expert's] report"); cf. Eastern Auto Distribs., Inc. v.
Peugeot Motors of America, Inc., 795 F.2d 329, 338 (4th Cir. 1986);
American Key Corp. v. Cole Nat'l Corp., 762 F.2d 1569, 1580-81 (11th
Cir. 1985); Merit Motors, Inc. v. Chrysler Corp., 569 F.2d 666, 672-
73 (D.C. Cir. 1977).  At any damages retrial there will be new
expert testimony and such a problem should not recur.  
B.   Damages Calculation Methodology
    Separate from its array of other challenges, CAPECO argues
that the district court should have compelled the parties to use the
"yardstick" method for calculating damages, rather than the "before
and after" method.  CAPECO contends that the yardstick method is
mandated by this court's opinion in Home Placement Service, Inc. v.
Providence Journal Co., 819 F.2d 1199 (1st Cir. 1987).  We
considered this precise issue in our review of the first trial.  We
decided that "[u]ltimately, the proper method should be determined
by the district court in accord with the facts of the situation.  
In this case, the district court will have exactly that opportunity
[on remand] . . . ."  Coastal Fuels, 79 F.3d at 200.   
    In its brief, CAPECO contends that Coastal's "undisputed
[lack of a] track record in San Juan" (emphasis omitted) should have
mandated the use of the yardstick method, but fails to address the
district court's finding that this issue had been waived.  CAPECO
has waived its argument that the yardstick method is required, and
is foreclosed from raising it again.
                               VI
    Given our holdings, we need not reach the myriad of other
claims CAPECO has raised.  Our disposition means that this matter
must be remanded and there will be, sadly, yet a third trial
(although quite limited) in this case.  We are distressed to remand
for a new damages trial when two juries have already spoken.  It
would seem in the interests of both parties to reach an agreement
resolving the issue of the damages to be paid for CAPECO'S price
discrimination.   
    The case is remanded for a new trial on damages on the
price discrimination claim in accordance with this opinion.
    No costs are awarded.

</body>

</html>